**BRITISH CALEDONIAN AIRWAYS LIMITED, Petitioner,**

v.

**Langhorne BOND, Administrator, Federal Aviation Administration, Respondent.**

**BALAIR AG, LUFTHANSA GERMAN AIRLINES, Swissair, Swiss Air Transport Company, LTD., Petitioners,**

v.

**Langhorne BOND, Administrator, Federal Aviation Administration, Respondent,**

**Alitalia-Linee Aeree Italiane-S.P.A., Intervenor.**

Nos. 79–1662, 79–1737.

United States Court of Appeals, District of Columbia Circuit.

Argued March 25, 1981.

Decided Sept. 2, 1981.

Arthur D. Bernstein, Washington, D. C., with whom G. Nathan Calkins and Suzette Matthews, Washington, D. C., were on the brief for petitioners in No. 79–1737.

Leonard N. Bebchick, Washington, D. C., for petitioner in No. 79–1662.

Scott T. Kragie, Asst. U.S. Atty., with whom Charles F. C. Ruff, U.S. Atty., Royce C. Lamberth and Kenneth M. Raisler, Asst. U.S. Attys., Clark H. Onstad, Chief Counsel, Federal Aviation Administration, and Wil-

liam T. Lake, Deputy Legal Advisor, Dept. of State, Washington, D. C., were on the brief for respondent.

Alan A. D'Ambrasio, Morrell I. Berkowitz and Mitchell J. Kassoff, New York City, were on the brief for intervenor in No. 79–1739.

Robert M. Hausman, Washington, D. C., was on the brief for the Government of the United Kingdom amicus curiae urging the order to be set aside.

Philip A. Lacovara and Jay Kelly Wright, Washington, D. C., was on the brief for Northwest Airlines, Inc., amicus curiae urging the order to be set aside.

Before: SWYGERT[*], Circuit Judge, United States Court of Appeals for the Seventh Circuit, ROBB and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROBB.

ROBB, Circuit Judge:

The petitioners in these consolidated actions are foreign airlines challenging "Special Federal Aviation Regulation No. 40" (SFAR 40) which was issued on June 6, 1979, by the Federal Aviation Administration in the aftermath of the catastrophic crash of a domestic DC–10 airliner on May 25, 1979. 44 Fed.Reg. 33396 (1979). SFAR 40 prohibited the operation of all Model DC–10 airplanes within the airspace of the United States, including those aircraft registered in other nations. The Administrator of the FAA terminated the effectiveness of SFAR 40 on July 13, 1979, five weeks after it was issued. The petitioners contend that the Administrator's actions in issuing SFAR 40 violated the provisions of several international agreements, and in particular Article 33 of the Convention on International Civil Aviation (the Chicago Convention) *opened for signature*, December 7, 1944, 61 Stat. 1180, 15 U.N.T.S. 295, T.I.A.S. No. 1591 (ratified by the United States August 9, 1946). The petitioners say this in turn constituted a violation of sections 1102 of the Federal Aviation Act of 1958. 49 U.S.C. § 1502 (1976). We agree.

---

[*] Sitting by designation pursuant to 28 U.S.C. § 291(a).

## I. FACTUAL BACKGROUND

### A. *The Crash*

On the afternoon of May 25, 1979, American Airlines DC–10 Flight 191 crashed on take-off from Chicago's O'Hare International Airport, killing all 271 persons on board. Early reports indicated that the left wing pylon and the engine attached to it had separated from the wing as the aircraft took off. Later investigations showed that as the engine-pylon assembly tore loose from the wing, it severed hydraulic and electrical lines, which caused one set of wing slats to retract. The retraction of these slats, which govern slow speed lift, in turn caused asymmetrical lift of the aircraft. The crew responded by slowing the aircraft speed, which normally is the appropriate remedial measure for loss of engine power. However the crew did not know that the damage had raised the stall speed. Therefore, as the crew reduced the speed, the left wing stalled—lost the ability to sustain lift—and the airplane rolled and fell to the ground.

### B. *The Investigation*

On May 28, 1979, in response to a recommendation of the National Transportation Safety Board, the FAA issued an Emergency Airworthiness Directive to all operators of U.S.-registered Model DC–10 aircraft, instructing them to inspect the pylon attach points on their aircraft. In keeping with agency practice, the FAA dispatched that directive to all foreign operators of DC–10 aircraft as well. The inspections undertaken in response to the May 28 directive revealed cracks in the pylon mounting assemblies of certain airplanes, SFAR 40 at 2, (J.A. 23) and other defects, including a failure of the spar web (a major structural component of the pylon) in a United Airlines DC–10 aircraft. (FAA Br. at 5, 10–11) Accordingly, the FAA issued another Emergency Airworthiness Directive on May 29, 1979, requiring more thorough inspections at more frequent intervals. In addition, the Administrator of the FAA grounded all domestic DC–10s, pending the more thorough investigations, and again notified foreign operators of the latest developments.

By June 2 the Safety Board had identified a relationship between a pattern of cracks in the pylons and a maintenance technique that violated the procedure recommended by McDonnell Douglas, the designer and manufacturer of the aircraft. McDonnell Douglas recommended removing the engine from the pylon before removal and reinstallation of the pylon to the wing attachment fittings. (J.A. 14) However, the Safety Board discovered that some maintenance personnel removed the pylon and the attached engine as a unit, using a forklift to transport the pylon-engine assembly away from the wing for inspection and repair. When reinstalling the pylon-engine assembly, the forklift operator had limited control over the precise placement of the pylon aft bulkhead into the wing structure. Vertical misalignment of even a fraction of an inch was thought to have caused the pylon flange to strike the forward lug of the wing fitting, which cracked the flange. The spar web cracking found on the United Airlines DC–10 however was apparently not caused by the improper maintenance technique. (FAA Br. at 10–11)

### C. *Issuance of SFAR 40*

On the evening of June 5, 1979, the FAA confirmed that two American Airlines DC–10 aircraft also had cracked pylon mounts, which were not discovered in the first series of inspections. Initially the FAA concluded that these cracks were not induced by faulty maintenance, but upon review of reports of the maintenance practices the FAA determined that the cracks were maintenance-induced. (J.A. 50–55) At 2:20 A.M. on June 6, 1979, the Administrator of the FAA determined that the public safety required him to issue an Emergency Order of Suspension, which prohibited the operation of all U.S.-registered Model DC–10 aircraft by suspending the type certificate for all DC–10s and terminating the effectiveness of the individual airworthiness certificates for each U.S.-registered DC–10 aircraft. (J.A. 19) Later that day the Administrator

issued SFAR 40, which expanded the scope of the earlier prohibition by prohibiting the operation within U.S. airspace of all foreign-registered DC–10 aircraft. Because of the apparent safety hazard, SFAR 40 went into effect on an emergency basis, without prior notice or hearings, in accordance with 5 U.S.C. § 553(b)(3)(B) (1976) and 49 U.S.C. § 1485(a) (1976). Interested persons were given until August 3, 1981, to comment on the regulation.

### D. The Response of Foreign Carriers to SFAR 40

After the Administrator suspended the DC–10 type certificate, a number of foreign governments, including those of the petitioners in the present case, provisionally suspended the individual airworthiness certificates for each of their DC–10 aircraft. During the week of June 11, 1979, European aviation authorities and European DC–10 operators conferred to determine whether and under what conditions the aircraft could be returned to service, consistent with the highest safety standards. At a June 15 meeting the conferees agreed on a special program of inspection and maintenance as a basis for each nation's aviation authorities to consider restoring national certificates of airworthiness to the DC–10s. (J.A. 63–68) The special inspection and maintenance program then was submitted to an Extraordinary Maintenance Review Board, which met on June 18 at Zurich. This meeting was attended by the representatives of 14 nations and 13 airlines, and the FAA sent three representatives as observers. (J.A. 69–84) The Board approved the comprehensive maintenance and inspection program as "an acceptable technical base for decision on the restoration of the DC–10's certificates of airworthiness, it being understood, that this decision will have to be taken individually by each European Civil Aviation Authority concerned." (J.A. 69) On June 19, 1979, the FAA had confirmed to the British Civil Aviation Authority (CAA) that the DC–10 engine-pylon assembly was the only area of concern. (J.A. 83–84) Also on June 19, the British CAA issued an airworthiness directive imposing a detailed program of inspection and maintenance as a condition of permitting the return to service of British-registered DC–10 aircraft. (J.A. 85–88) At the same time the CAA withdrew the provisional suspension of DC–10 certificates of airworthiness. (J.A. 89–90) The other member states of the European Civil Aviation Conference took similar action. Notice of these actions was communicated to the FAA and the International Civil Aviation Organization.

On June 25, 1979, representatives of member states of the European Civil Aviation Conference met in Paris with a delegation from the United States and requested rescission of SFAR 40 as to those DC–10 aircraft for which certificates of airworthiness had been re-issued. (J.A. 96–97) In a statement issued June 25 the representatives of the European States took the position that

> According to Article 33 of the Chicago Convention, certificates of airworthiness issued by the State of registry have to be recognized by the other Contracting States. There is no doubt that the requirements under which these certificates were issued are equal to or above the minimum standards established under the Chicago Convention. . . . No evidence has been presented by the United States authorities to the effect that the requirements under which European States have issued their certificates of airworthiness fall short of . . . minimum standards.

(J.A. 96) Citing Article 9(b) of the Chicago Convention the United States rejected the request of the Conference and maintained that its position was consistent with its international obligations and with domestic law. (J.A. 98–99)

### E. The Litigation

On June 27, 1979, petitioner British Caledonian Airways Limited filed in this court its petition for review of SFAR 40. (Pet. for Review, No. 79–1662) On the same day petitioners Belair AG, Lufthansa German Airlines, and Swissair, Swiss Air Transport Company, Ltd., filed with the FAA a petition for rulemaking in which they sought

immediate adoption of a rule rescinding SFAR 40. The FAA did not act on the petition, and Belair, Lufthansa, and Swissair filed their petition for review in this court on July 11, 1979. (Pet. for Review, No. 79–1738) Jurisdiction was based on 49 U.S.C. § 1486 (1976).

The United States and the member states of the European Civil Aviation Conference continued to confer but were unable to resolve the dispute over the United States' refusal to rescind SFAR 40. However on July 13, 1979, the FAA terminated its suspension of the DC–10 type certificate and at the same time rescinded SFAR 40. By order dated September 10, 1979, this court consolidated the two petitions for review, and on October 16, 1979, we issued an order denying the FAA's motion to dismiss the action on mootness grounds and granting leave to intervene to Alitalia-Linee Aeree Italiane. On February 11, 1980, we entered an order permitting Northwest Airlines, Inc. to participate as *amicus curiae* in support of the foreign airlines.

## II.  JUSTICIABILITY

The government argues as a threshold matter that the petitioners may not obtain judicial review of SFAR 40 because these consolidated actions are moot and in any event present non-justiciable political questions arising under treaty provisions that are not self-executing. The mootness contention is that because the FAA terminated SFAR 40 on July 13, 1979, the relief requested by the petitioners is totally prospec-

tive. Moreover, the government argues, since there is no longer an order "to affirm, modify, or set aside" under 49 U.S.C. § 1486(d),[1] this court lacks jurisdiction to rule upon the petitioners' claims. Because we find that the FAA's order in the present case is typical of those capable of repetition yet evading review, we reject the contention that the cases are moot. We also do not agree that the petitions for review present non-justiciable political questions.

### A.  *Mootness*

■ The mootness doctrine is derived primarily from Article III of the United States Constitution, which limits federal court jurisdiction to "cases" or "controversies". A matter is thus not within the federal judicial power if there is no "present, live controversy of the kind that must exist if we are to avoid advisory opinions on abstract propositions of law." *Hall v. Beals*, 396 U.S. 45, 48, 90 S.Ct. 200, 201–202, 24 L.Ed.2d 214 (1969). The FAA argues in the present case that the foreign airlines' petitions for review seek precisely this type of advisory opinion. (FAA Br. at 17–22) In our view this characterization of the relief sought disregards the well-recognized exception to the mootness doctrine first articulated in *Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911). The Supreme Court held in the *Southern Pacific* case that consideration of questions raised by actions of the ICC ought not to be defeated by "short term orders, capable of repetition, yet evading review

**1.** Section 1486 provides in pertinent part:

Order subject to review; petition for review

(a) Any order, affirmative or negative, issued by the Board or Administrator under this chapter, except any order in respect of any foreign air carrier subject to the approval of the President as provided in section 1461 of this title, shall be subject to review by the courts of appeals of the United States or the United States Court of Appeals for the District of Columbia upon petition, filed within sixty days after the entry of such order, by any person disclosing a substantial interest in such order. After the expiration of said sixty days a petition may be filed only by leave of court upon a showing of reasonable grounds for failure to file the petition theretofore.

49 U.S.C. § 1486(a) (1976).

\*    \*    \*    \*    \*    \*

Power of court

(d) Upon transmittal of the petition to the Board or Administrator, the court shall have exclusive jurisdiction to affirm, modify, or set aside the order complained of, in whole or in part, and if need be, to order further proceedings by the Board or Administrator. Upon good cause shown and after reasonable notice to the Board or Administrator, interlocutory relief may be granted by stay of the order or by such mandatory or other relief as may be appropriate.

49 U.S.C. § 1486(d) (1976).

...." *Id.* at 515, 31 S.Ct. at 283. The Court recently applied this exception in the case of *SEC v. Sloan*, 436 U.S. 103, 98 S.Ct. 1702, 56 L.Ed.2d 148 (1978), to permit review of a series of summary 10-day suspension orders which continuously suspended trading in a corporation's common stock but which had expired by the time the propriety of the orders was litigated. *Id.* at 106–10, 98 S.Ct. at 1705–08. We, too, have recently invoked the exception to permit review of two orders by the Nuclear Regulatory Commission allowing a utility company to release radioactive gas into the atmosphere from the Three Mile Island nuclear plant. *Sholly v. Nuclear Regulatory Comm'n*, No. 80–1691 (D.C.Cir. Nov. 19, 1980), slip op. at 8–12, *cert. granted on another issue,* 451 U.S. 1016, 101 S.Ct. 3004, 69 L.Ed.2d 387 (1981).

The general principle announced in the *Southern Pacific* case was refined by the Supreme Court in *Weinstein v. Bradford,* 423 U.S. 147, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975). In that case the Court declared that a case is not moot when "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Id.* at 149, 96 S.Ct. at 349. The government argues here that the petitioners fail to satisfy either requirement of this test. First, the FAA contends that although SFAR 40 was in effect only from June 6, 1979 to July 13, 1979 the petitioners could have obtained judicial review during the life of the order, for "[t]his Court has amply demonstrated its willingness and ability to move speedily when justice so requires." (FAA Br. at 23) We respond by

noting that the petitioners did seek judicial review while SFAR 40 was still in effect and by repeating our answer to a similar charge made by the government in the *Sholly* case:

> [W]e believe that it is unreasonable for the Government to take the position that, in order to seek judicial review of a license amendment, a petitioner must race to the courthouse before the NRC takes an irreversible action. Even if a petitioner could file the petition before the NRC acted, a court more often than not will decline to grant emergency relief.

*Sholly v. Nuclear Regulatory Comm'n, supra,* slip op. at 9 n.14. We conclude that the action challenged here meets the first requirement of the test set out in the *Weinstein* case. Second, despite the government's assertions to the contrary, (FAA Br. at 20–23) we think there is a reasonable expectation that the petitioners will be subjected to the same action again. Although we recognize that air disasters of the magnitude of the DC–10 crash are, fortunately, rare it is not so unusual for the aviation authorities to be at first uncertain as to the precise cause of a crash. As long as the FAA Administrator asserts that he has the legal authority, under such circumstances, to disregard valid airworthiness certificates issued by nations with whom the United States has entered into binding aviation agreements, these nations reasonably can expect to be subjected to the same action at some time in the future. Therefore, we are satisfied that the petitioners meet the second requirement of the *Weinstein* test as well and that this case is not moot.[2]

---

**2.** The foreign airlines intend to take any judgment in their favor to the Court of Claims in an attempt to recover money damages. The government contends that under these circumstances any opinion we might render on the merits would be purely advisory. We do not agree for two reasons. First, the Court of Claims is expressly prohibited by statute from entertaining actions based on or inextricably bound up with alleged violations or international agreements. 28 U.S.C. § 1502 (1976). Second, under 49 U.S.C. § 1486(a) (1976), the

courts of appeals have exclusive jurisdiction to review orders of the FAA Administrator. Thus, although it is now impossible for us to reverse the actions of the Administrator through injunctive relief, the remaining consequences of the litigation (i.e., the possibility of obtaining money damages concerning which we express no opinion) also prevent us from holding that this case is moot. *See Powell v. McCormack,* 395 U.S. 486, 495–500, 89 S.Ct. 1944, 1950–1953 (1969).

## B. *A Non-Self-Executing Treaty Raising Political Questions?*

The petitioners contend that the FAA Administrator's refusal to rescind SFAR 40, after the foreign aviation authorities revalidated the airworthiness certificates of their DC-10s, violated various multilateral and bilateral agreements between the United States and the petitioners' governments, and that the refusal was in turn a violation of section 1102 of the Federal Aviation Act of 1958. 49 U.S.C. § 1502 (1976).[3] The government argues, however, that the petitioners may not seek judicial enforcement of rights and obligations under these international agreements because the agreements in question are not "self-executing" and present non-justiciable political questions. (FAA Br. at 24-38)

In *Whitney v. Robertson*, 124 U.S. 190, 8 S.Ct. 456, 31 L.Ed. 386 (1888), the Supreme Court explained the difference between self-executing and non-self-executing treaties:

A treaty is primarily a contract between two or more independent nations, and is so regarded by writers on public law.

---

**3.** Section 1502 of the Federal Aviation Act provides as follows:

§ 1502. International agreements

In exercising and performing their powers and duties under this chapter, the Board and the Secretary of Transportation shall do so consistently with any obligation assumed by the United States in any treaty, convention, or agreement that may be in force between the United States and any foreign country or foreign countries, and shall take into consideration any applicable laws and requirements of foreign countries and the Board shall not, in exercising and performing its powers and duties with respect to certificates of convenience and necessity, restrict compliance by any air carrier with any obligation, duty, or liability imposed by any foreign country: *Provided*, That this section shall not apply to any obligation, duty, or liability arising out of a contract or other agreement, heretofore or hereafter entered into between an air carrier, or any officer or representative thereof, and any foreign country, if such contract or agreement is disapproved by the Board as being contrary to the public interest. Pub.L. 85-726, Title XI, § 1102, Aug. 23, 1958, 72 Stat. 797.

49 U.S.C. § 1502 (1976). The pertinent multilateral agreement in this case is the Convention on International Civil Aviation (the Chicago Convention), *opened for signature*, December 7, 1944, 61 Stat. 1180, 15 U.N.T.S. 295, T.I.A.S. No. 1591 (ratified by the United States August 9, 1946.) Thus, the United States had already ratified the Chicago Convention (1946) when Congress enacted the Federal Aviation Act (1958), with its direction to the FAA Administrator to comply with U.S. obligations under treaties, conventions, and other agreements.

The United States has also entered into bilateral aviation agreements with many nations, including the governments of the petitioners. *See, e.g.,*

Air Services Agreement between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland of July 23, 1977,

T.I.A.S. No. 8641, as amended April 25, 1978, T.I.A.S. No. 8965 (Bermuda II);

Air Transport Agreement between the United States of America and the Federal Republic of Germany of July 7, 1955, 7 U.S.T. 527, T.I.A.S. No. 3565, as amended April 5, 1968, 19 U.S.T. 4402, T.I.A.S. No. 6434, and November 1, 1978, T.I.A.S. No. 9591;

Air Transport Agreement between the Government of the United States of America and the Government of the Italian Republic of June 22, 1970, 21 U.S.T. 2096, T.I.A.S. No. 6957;

Interim Agreement between the United States of America and Switzerland relating to Air Transport Services of August 3, 1945, 60 Stat. 1935, T.I.A.S. No. 1576, as amended May 13, 1949, 63 Stat. 2437, T.I.A.S. No. 1929 and December 9, 1970, 21 U.S.T. 2658, T.I.A.S. No. 7008; Airworthiness Agreement, United States-United Kingdom, December 28, 1972, 23 U.S.T. 4309, T.I.A.S. No. 7537;

Airworthiness Agreement, United States-Switzerland, October 13, 1961, 13 U.S.T. 2479, T.I.A.S. No. 5214, as amended January 7, 1977, 28 U.S.T. 2446, T.I.A.S. No. 8563; Airworthiness Agreement, United States-Federal Republic of Germany, May 31, 1974, 25 U.S.T. 3056, T.I.A.S. No. 7965;

Airworthiness Agreement, United States-Italy, August 3, 1973, 25 U.S.T. 1565, T.I.A.S. No. 7895.

Petitioner British Caledonian Airways rests its argument in the present case solely on the Air Services Agreement between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland of July 23, 1977, T.I.A.S. No. 8641, as amended April 25, 1978, T.I.A.S. No. 8695 (Bermuda II). The other petitioners rely on both the provisions of the Chicago Convention and the pertinent bilateral agreements now in force between their respective governments and the United States. This distinction does not affect our analysis of the legality of SFAR 40.

For the infraction of its provisions a remedy must be sought by the injured party through reclamations upon the other. When the stipulations are not self-executing, they can only be enforced pursuant to legislation to carry them into effect .... If the treaty contains stipulations which are self-executing, that is, require no legislation to make them operative, to that extent they have the force and effect of a legislative enactment.

*Id.* at 194, 8 S.Ct. at 458. In general, courts in the United States have exclusive authority to interpret an international agreement to which the United States is a party for the purpose of applying it in litigation as the domestic law of the United States. *Restatement (Second), Foreign Relations Law of the United States* § 150 (1965). Similarly, whether a given treaty is self-executing or requires special implementing legislation to give force and effect to its provisions is primarily a domestic question of construction for the courts. *Diggs v. Richardson,* 180 U.S.App.D.C. 376, 379, 555 F.2d 848, 851 (1976); Restatement § 154. Apart from those few instances in which the language of the treaty provision expressly calls for legislative implementation or the subject matter is within the exclusive jurisdiction of Congress, such as the appropriation of money, the question is one of interpretation. *United States v. Postal,* 589 F.2d 862, 877 (5th Cir. 1979). In such cases the courts must "look to the intent of the signatory

parties as manifested by the language of the instrument, and, if the instrument is uncertain, recourse must be had to the circumstances surrounding its execution." *Diggs v. Richardson, supra,* 180 U.S.App. D.C. at 379, 555 F.2d at 851. *See also Restatement, supra,* at 141.

■ The pertinent treaty provision in the present case is Article 33 of the Chicago Convention. Article 33 provides as follows:

Certificates of airworthiness and certificates of competency and licenses issued or rendered valid by the contracting State in which the aircraft is registered, shall be recognized as valid by the other contracting States, provided that the requirements under which such certificates or licenses were issued or rendered valid are equal to or above the minimum standards which may be established from time to time pursuant to this Convention.

Thus, under Article 33, the judgment of the country of registry that an aircraft is airworthy must be respected, unless the country of registry is not observing the "minimum standards." Annex 8 to the Chicago Convention[4] contains the international standards of airworthiness contemplated by Article 33 and specifically provided for in Article 37.[5] Annex 8 was adopted and is periodically amended by the Council of the International Civil Aviation Organization (ICAO), pursuant to Article 90 of the Chicago Convention.[6]

---

**4.** International Civil Aviation Organization (ICAO), International Standards, Airworthiness of Aircraft [Annex 8, Chicago Convention] (6th ed. 1973, as supplemented by Amendment 92, Feb. 27, 1975). *See Aviation Law Reporter* ¶ 28,014 (CCH).

**5.** Article 37 provides in pertinent part:

Each contracting State undertakes to collaborate in securing the highest *practicable degree of uniformity* in regulations, standards, procedures, and organization in relation to aircraft, personnel, airways and auxiliary services in all matters in which such uniformity will facilitate and improve air navigation.

To this end the International Civil Aviation Organization *shall adopt* and amend from time to time, as may be necessary, *international standards* and recommended practices and procedures dealing with:

\* \* \* \* \* \*

(c) Rules of the air and air traffic control practices;

(d) Licensing of operating and mechanical personnel;

(e) *Airworthiness of aircraft;*

\* \* \* \* \* \*

(k) Aircraft in distress and investigation of accidents; and such other matters concerned with safety, regularity, and efficiency of air navigation as may from time to time appear appropriate.

[Emphasis added]

**6.** Under Article 90, Annexes become effective and binding upon the contracting states in the following manner:

(a) The adoption by the Council of the Annexes described in Article 54, subparagraph (1), shall require the vote of two-thirds of the

Because the Chicago Convention itself provides that the ICAO, and not the individual contracting states, will adopt the airworthiness standards now contained in Annex 8, we cannot say that Article 33 requires legislative implementation by Congress. In contrast, several provisions of the Chicago Convention clearly require the contracting states, as distinguished from ICAO, to take the necessary steps under national law to implement the purposes of those provisions. For example, pursuant to Article 22:

> Each contracting State agrees to adopt all practicable measures, through the issuance of special regulations or otherwise, to facilitate and expedite navigation by aircraft between the territories of contracting States, and to prevent unnecessary delays to aircraft, crews, passengers and cargo, especially in the administration of the laws relating to immigration, quarantine, customs and clearance.

*See also* Articles 12, 14, 23, and 28. Other provisions of the Convention, such as Article 33, set forth rights or obligations of the contracting states and their flag carriers that require no legislation or administrative regulations to implement them. For example, the first paragraph of Article 5 provides that "[e]ach contracting State agrees that all aircraft of the other contracting States, being aircraft not engaged in scheduled international air services *shall have the right*, subject to the observance of the terms of this Convention, to make flights into or in transit non-stop across its territory . . . ." [Emphasis added] *See also* Articles 8, 15, 16, 20, 24, 29, 32, 35. We think these provisions state rules that may not be qualified or modified through legislation or administrative regulations enacted by the individual signatory nations, consistent with the international obligations undertaken by each nation that is a party to the Convention. Article 33 is such a provision and we

therefore hold that it was intended to operate upon ratification of the Convention and promulgation of the minimum airworthiness standards—that is, we conclude that Article 33 is self-executing.

The government also urges us to decline to review the Administrator's action on the ground that review would run afoul of the political question doctrine. *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). The government avers that if we ruled on the applicability of Article 33, we would have to determine whether the petitioners' aircraft were certified under requirements that meet the minimum safety standards established pursuant to the Chicago Convention. (Annex 8) That determination, says the government, would become entangled with the political question doctrine for two reasons. First, according to the FAA, "[t]here are no 'judicially discoverable and manageable standards' by which a court can determine whether the safety provisions of the relevant international agreements have been properly implemented." (FAA Br. at 31) Second, the government contends that the power to execute the United States' obligations under treaties, including those in the air safety field, is constitutionally committed to the executive branch. The FAA Administrator, says the government, has taken the position that his actions were consistent with all pertinent international obligations and "for a court to second-guess this executive branch judgment would evidence a lack of respect for a coordinate branch" of government. (FAA Br. at 31–32)

We do not agree that our task is to determine whether the petitioners' aircraft were certified under requirements that meet the minimum safety standards contained in Annex 8. Rather, our duty is to determine whether the FAA Administrator

Council at a meeting called for that purpose and shall then be submitted by the Council to each contracting State. Any such Annex or any amendment of an Annex shall become effective within three months after its submission to the contracting States or at the end of such longer period of time as the

Council may prescribe, unless in the meantime a majority of the contracting States register their disapproval with the Council.

(b) The Council shall immediately notify all contracting States of the coming into force of any Annex or amendments thereto.

acted consistently with and followed the procedures mandated by the various international agreements, as is required by section 1102 of the Federal Aviation Act of 1958. 49 U.S.C. § 1502 (1976). This is a *legal* inquiry that does not entail examination of technical materials at all. Therefore we do not lack judicially manageable standards.

We also reject the proposition that the determination in this case of whether the FAA Administrator has acted consistently with this nation's treaty obligations is a question that is constitutionally committed to the executive branch of the government. It is of the utmost significance that when the Administrator issued SFAR 40, he had neither found nor intimated that every foreign government which had certificated its DC–10s had failed to observe the minimum safety standards referred to in Article 33 and set forth in Annex 8. Nor had he made such a finding when he refused to rescind SFAR 40 as to those foreign aircraft holding revalidated certificates of airworthiness. Yet, under Article 33 and the pertinent bilateral agreements, failure to observe the minimum safety standards in issuing airworthiness certificates is the only ground on which one country may question the airworthiness judgment of the country of registry. If the Administrator had questioned the foreign government's compliance with minimum airworthiness standards, other provisions of the bilateral agreements would have required him to consult with each of the contracting parties before suspending or revoking operating authorizations.[7] Perhaps once the consultation-negotiation process contemplated by these provisions had begun, it would be inappropriate, under the political question doctrine, for a court to intervene to resolve the dispute. Here, however, the Administrator did not question the foreign governments' observance of the minimum safety standards,[8] and we consequently are faced with the purely legal issue of whether an administrative order, which is in our exclusive jurisdiction to review, 49 U.S.C. § 1486(a), comported with the applicable treaty requirements, as required by 49 U.S.C. § 1502.

### III. THE LEGALITY OF SFAR 40

■ Section 1102 of the Federal Aviation Act of 1958, 49 U.S.C. § 1502 (1976), requires the Administrator, in exercising and performing his powers and duties, to "do so consistently with any obligation assumed by the United States in any treaty, convention, or agreement that may be in force between the United States and any foreign country or foreign countries." (*See* n.3, *supra*) As we have said, Article 33 of the Chicago Convention requires each contracting state, including the United States, to recognize as valid the certificates of airworthiness issued by the other contracting states, as long as those certificates are issued under requirements that are equal to or above the minimum standards established by the International Civil Aviation Organization. Section 1102 of the FAA requires the Administrator to discharge his duties consistently with the obligation assumed by the United States in Article 33. Because the Administrator at no time questioned whether the foreign governments met the minimum safety standards set by the ICAO, his issuance of SFAR 40 and his refusal to rescind the order after the foreign governments had revalidated the airworthiness certificates for aircraft flying under their flags would

---

7. *See, e.g.*, Bermuda II, *supra* note 3; Protocol Between the Government of the United States of America and the Government of Belgium Relating to Air Transport, Dec. 12 & 14, 1978, 30 U.S.T. 620, T.I.A.S. No. 9207. *See also* J.A. 120–21 ("United States Standard Form of Bilateral Air Transport Agreement", Art. 6).

8. At oral argument, government counsel conceded in response to a direct inquiry that the FAA did not question that the foreign governments had met the minimum safety standards.

Rather, the government claimed to have "reserved" that position as a fallback, in the event that this court rejected the other sources of authority to issue SFAR 40 claimed by the Administrator. Although we recognize a charge that a foreign government failed to observe the minimum safety standards is a serious and sensitive allegation, we cannot, for this reason, abandon our refusal to accept *post hoc* rationalizations for administrative actions.

appear to have violated Article 33 and, therefore, section 1102. The Administrator now maintains, however, that there are provisions in the Chicago Convention and the bilateral agreements which override Article 33 and recognize his authority to issue SFAR 40. In addition, when he promulgated SFAR 40 the Administrator cited four sections of the Federal Aviation Act as a statutory basis for the regulation.

### A. *Article 9 of the Chicago Convention*

Although the Administrator did not cite Article 9 of the Chicago Convention when he issued SFAR 40, he now says that this treaty provision recognizes each contracting party's unfettered "right to regulate the safety of aircraft operations in their respective territories," thus overriding Article 33. (FAA Br. at 46) Article 9 provides in pertinent part:

(a) Each contracting State may, for reasons of military necessity or public safety, restrict or prohibit uniformly the aircraft of other States from flying over certain areas of its territory, provided that no distinction in this respect is made between the aircraft of the State whose territory is involved, engaged in international scheduled airline services, and the aircraft of the other contracting States likewise engaged. Such prohibited areas shall be of reasonable extent and location so as not to interfere unnecessarily with air navigation. Descriptions of such prohibited areas in the territory of a contracting State, as well as any subsequent alterations therein, shall be communicated as soon as possible to the other contracting States and to the International Civil Aviation Organization.·

(b) Each contracting State reserves also the right, in exceptional circumstances or during a period of emergency, or in the interest of public safety, and with immediate effect, temporarily to restrict or prohibit flying over the whole or any part of its territory, on condition that such restriction or prohibition shall be applicable without distinction of nationality to aircraft of all other States.

(c) Each contracting State, under such regulations as it may prescribe, may require any aircraft entering the areas contemplated in subparagraphs (a) or (b) above to effect a landing as soon as practicable thereafter at some designated airport within its territory.

For authority to issue SFAR 40 the Administrator relies in particular on section (b) of Article 9, which allows each contracting state to restrict or prohibit flying over all or any part of its territory "in exceptional circumstances or during a period of emergency, or in the interest of public safety." We agree with the petitioners and amicus Northwest Airlines, however, that the government's interpretation of Article 9(b) disregards the context of that provision and hence does not reflect its true meaning.

Article 9 appears in Chapter II of the Convention—"Flight Over Territory of Contracting States"—while Article 33 is in Chapter V—"Conditions to Be Fulfilled With Respect to Aircraft." In addition, Article 9 is marginally annotated with the phrase "Prohibited Areas". We think Article 9 is aimed at restricting the territorial access of all aircraft, rather than at restricting the movements of particular types of aircraft. Thus, Article 9(a) authorizes a permanent prohibition on flight over "certain areas" (strategically sensitive areas), while Article 9(b) permits a government, in "exceptional circumstances", temporarily to restrict or prohibit "flying over the whole or any part of" that country's territory. In short, Article 9 permits a country to safeguard its airspace when entry by all aircraft would be dangerous or intrusive because of conditions on the ground. Article 9 does not allow one country to ban landing and take-off because of doubts about the airworthiness of particular foreign aircraft, in derogation of Article 33. If doubts about airworthiness exist, one country may refuse to recognize another country's certificate of airworthiness, but only if the certificating nation has not observed the minimum standards of airworthiness established in Annex 8 pursuant to Articles 33 and 37 of the Chicago Convention. As we have emphasized, the Administrator at no time ques-

tioned the foreign governments' compliance with the minimum standards of airworthiness.

### B. *The Bilateral Aviation Agreements*

The government further argues that a provision of the various bilateral aviation agreements authorized the FAA Administrator to take emergency action banning landings and take-offs in the United States by foreign-registered DC–10s. The standard form of bilateral air transport agreement used by the United States provides in Article 4 as follows:

(1) Each Party may revoke, suspend or limit the operating authorizations or technical permissions of an airline designated by the other Party where:

(a) substantial ownership and effective control of that airline are not vested in the other Party or the other Party's nationals;

(b) that airline has failed to comply with the laws and regulations referred to in Article 5 of this Agreement [Application of Laws]; or

(c) the other Party is not maintaining and administering the Standards as set forth in Article 6 . . . [Safety and Airworthiness].

(2) Unless immediate action is essential to prevent further non-compliance with subparagraphs (1)(b) or (1)(c) of this Article, the rights established by this article shall be exercised only after consultation with the other Party.

(J.A. 118) *See also* Article 5, Bermuda II, *supra* n.7. We agree that this provision allows the United States to take immediate action, without consultations, if such action is necessary to prevent further non-compliance with U.S. laws and regulations (subparagraph (1)(b)) or with the applicable airworthiness standards (subparagraph (1)(c)). However this provision cannot help the Administrator here, for the reason that none of these alleged justifications for revoking, suspending or limiting operating authorizations was identified or relied on by the Administrator when he issued SFAR 40 or when he refused to recognize the foreign

airlines' revalidated certificates of airworthiness. We recognize the diplomatic sensitivity of an allegation that a foreign nation has been derelict in complying with law or relevant standards; but if the government wishes to rely on the dereliction it must grasp that nettle.

### C. *Suspension of the DC–10 Type Certificate*

The DC–10 aircraft was type-certificated in the United States according to Federal Aviation Administration regulations. 14 C.F.R. Part 25 (1979). On June 6, 1979, shortly before the issuance of SFAR 40, the FAA Administrator issued an Emergency Order of Suspension, (J.A. 19) which suspended the DC–10 type certificate. According to the government, as long as the U.S.-type certificate was suspended, the FAA could refuse to recognize foreign certificates of airworthiness, since those certificates were based on the U.S.-type certificate. Therefore, says the government, the issuance of SFAR 40 and the refusal to rescind it after the foreign nations had reissued airworthiness certificates did not violate the applicable multilateral and bilateral agreements.

Annex 8 of the Chicago Convention provides that a contracting state may recognize as valid an airworthiness certificate of a foreign contracting state if the foreign state issued the certificate on the basis of satisfactory evidence that the aircraft is in compliance with appropriate airworthiness requirements, that is, a comprehensive and detailed national airworthiness code that is consistent with the standards of Annex 8. (FAA Br. at 57) Annex 8 includes requirements relating to the design, construction, material, specifications, and performance for safe operation. *Id.* Specifically, Part II, sections 3.1, .2, and .3, require an "approved design" consisting of drawings, specifications, reports and other appropriate documentation, inspections during construction, and flight testing to show compliance with the applicable airworthiness requirements. *Id.* When a certificate of airworthiness is based upon such satisfactory evidence, Annex 8 permits a subsequent state

of registry to rely on this original certificate of airworthiness for the particular type of aircraft as "satisfactory evidence" upon which it can predicate its own certificate of airworthiness. (FAA Br. at 57–58) If the original or "type" certificate is suspended, then, according to the government, the "satisfactory evidence" upon which subsequent certificates of airworthiness were issued by foreign nations no longer exists, and the certificates need not be recognized as valid. We express no opinion as to the validity of this argument. It is enough to say that the record does not show that the foreign nations which issued certificates of airworthiness to the petitioners based those certificates on the U.S.-type certificate for the DC–10. Indeed, the British Civil Aviation Authority expressly stated that in reissuing its certificates of airworthiness, it "took account of FAA type certification as a useful basis, but called for additional substantiation in a number of areas, including fail safe and fatigue and made use of Doug-

las fatigue test information not required by FAA in their evaluation." (J.A. 90) The FAA has characterized this type of independent determination of airworthiness as "considerably risky." (FAA Br. at 59) We believe however that the multilateral and bilateral agreements intend the states of registry to resolve questions of safety and continuing airworthiness that may arise after the original airworthiness and type certificates were issued. Therefore, we reject this justification for the Administrator's action in issuing SFAR 40 and in refusing to recognize the re-issued certificates of airworthiness.

### D. *The Federal Aviation Act*

When he promulgated SFAR 40, the Administrator invoked four sections of the Federal Aviation Act as a statutory basis for his action. These sections are 49 U.S.C. §§ 1348, 1354, 1421, and 1423 (1976).[9] Of

---

9. § 1348. Airspace control and facilities.
(a) Use of airspace
The Secretary of Transportation is authorized and directed to develop plans for and formulate policy with respect to the use of the navigable airspace; and assign by rule, regulation, or order the use of the navigable airspace under such terms, conditions, and limitations as he may deem necessary in order to insure the safety of aircraft and the efficient utilization of such airspace. He may modify or revoke such assignment when required in the public interest.
(b) Air navigation facilities
The Secretary of Transportation is authorized, within the limits of available appropriations made by the Congress, (1) to acquire, establish, and improve air-navigation facilities wherever necessary; (2) to operate and maintain such air-navigation facilities; (3) to arrange for publication of aeronautical maps and charts necessary for the safe and efficient movement of aircraft in air navigation utilizing the facilities and assistance of existing agencies of the Government so far as practicable; and (4) to provide necessary facilities and personnel for the regulation and protection of air traffic.
(c) Air traffic rules
The Secretary of Transportation is further authorized and directed to prescribe air traffic rules and regulations governing the flight of aircraft, for the navigation, protection, and identification of aircraft, for the protection of persons and property on the ground, and for the efficient utilization of the navigable airspace, including rules as to safe altitudes of flight and rules for the prevention of collision between aircraft, between aircraft and land or water vehicles, and between aircraft and airborne objects.
(d) Applicability of administrative procedure provisions
In the exercise of the rulemaking authority under subsections (a) and (c) of this section, the Secretary of Transportation shall be subject to the provisions of subchapter II of chapter 5 of title 5, notwithstanding any exception relating to military or naval functions in section 553 of title 5.
(e) Exemptions
The Secretary of Transportation from time to time may grant exemptions from the requirements of any rule or regulation prescribed under this subchapter if he finds that such action would be in the public interest.
(f) Exception for military emergencies
When it is essential to the defense of the United States because of a military emergency or urgent military necessity, and when appropriate military authority so determines, and when prior notice thereof is given to the Secretary of Transportation, such military authority may authorize deviation by military aircraft of the national defense forces of the United States from air traffic rules issued pursuant to this subchapter. Such prior notice shall be given to the Secretary of Transportation at the earliest time practicable and, to the extent time and circumstances permit, every reasonable effort shall be made to con-

these four sections, three have no relation to airworthiness decisions but simply define general functions of the Administrator. Section 1348 grants him the power to "de-

sult fully with the Secretary of Transportation and to arrange in advance for the required deviation from the rules on a mutually acceptable basis.

(Pub.L. 85–726, title III, § 307, Aug. 23, 1958, 72 Stat. 749; Pub.L. 89–670, § 6(c)(1), Oct. 15, 1966, 80 Stat. 937.)

§ 1354. Other powers and duties of Secretary of Transportation

(a) Generally

The Secretary of Transportation is empowered to perform such acts, to conduct such investigations, to issue and amend such orders, and to make and amend such general or special rules, regulations, and procedures, pursuant to and consistent with the provisions of this charter, as he shall deem necessary to carry out the provisions of, and to exercise and perform his powers and duties under, this chapter.

§ 1421. Powers and duties of Secretary of Transportation

(a) Minimum standards; rules and regulations

The Secretary of Transportation is empowered and it shall be his duty to promote safety of flight of civil aircraft in air commerce by prescribing and revising from time to time:

(1) Such minimum standards governing the design, materials, workmanship, construction, and performance of aircraft, aircraft engines, and propellers as may be required in the interest of safety;

(2) Such minimum standards governing appliances as may be required in the interest of safety;

(3) Reasonable rules and regulations and minimum standards governing, in the interest of safety, (A) the inspection, servicing, and overhaul of aircraft, aircraft engines, propellers, and appliances; (B) the equipment and facilities for such inspection, servicing, and overhaul; and (C) in the discretion of the Secretary of Transportation, the periods for, and the manner in, which such inspection, servicing, and overhaul shall be made, including provision for examinations and reports by properly qualified private persons whose examinations or reports the Secretary of Transportation may accept in lieu of those made by its officers and employees;

(4) Reasonable rules and regulations governing the reserve supply of aircraft, aircraft engines, propellers, appliances, and aircraft fuel and oil, required in the interest of safety, including the reserve supply of aircraft fuel and oil which shall be carried in flight;

(5) Reasonable rules and regulations governing, in the interest of safety, the maximum hours or periods of service of airmen, and other employees, of air carriers; and

(6) Such reasonable rules and regulations, or minimum standards, governing other practices, methods, and procedure, as the Secretary of Transportation may find necessary to provide adequately for national security and safety in air commerce.

(b) Consideration of needs of service; classification of standards, rules, regulations, and certificates

In prescribing standards, rules, and regulations, and in issuing certificates under this subchapter, the Secretary of Transportation shall give full consideration to the duty resting upon air carriers to perform their services with the highest possible degree of safety in the public interest and to any differences between air transportation and other air commerce; and he shall make classifications of such standards, rules, regulations, and certificates appropriate to the differences between air transportation and other air commerce. The Secretary of Transportation may authorize any aircraft, aircraft engine, propeller, or appliance, for which an aircraft certificate authorizing use thereof in air transportation has been issued, to be used in other air commerce without the issuance of a further certificate. The Secretary of Transportation shall exercise and perform his powers and duties under this chapter in such manner as will best tend to reduce or eliminate the possibility of, or recurrence of, accidents in air transportation, but shall not deem himself required to give preference to either air transportation or other air commerce in the administration and enforcement of this subchapter.

(c) Exemptions

The Secretary of Transportation from time to time may grant exemptions from the requirements of any rule or regulation prescribed under this subchapter if he finds that such action would be in the public interest.

(d) Installation of emergency locator transmitters; aircraft subject to coverage

(1) Except with respect to aircraft described in paragraph (2) of this subsection, minimum standards pursuant to this section shall include a requirement that emergency locator transmitters shall be installed—

(A) on any fixed-wing, powered civil aircraft for use in air commerce the manufacture of which is completed, or which is imported into the United States, after one year following January 2, 1974; and

(B) on any fixed-wing, powered civil aircraft used in air commerce after three years and six months following such date.

(2) The provisions of this subsection shall not apply to:

(A) Turbojet-powered aircraft;

(B) Aircraft while engaged in scheduled flights by scheduled air carriers certificated by the Board;

velop plans for and formulate policy with respect to the use of the navigable airspace" and to "prescribe air traffic rules and regulations." Section 1354(a) grants

(C) Aircraft while engaged in training operations conducted entirely within a fifty-mile radius of the airport from which such local flight operations began;

(D) Aircraft while engaged in flight operations incident to design and testing;

(E) New aircraft while engaged in flight operations incident to their manufacture, preparations, and delivery;

(F) Aircraft while engaged in flight operations incident to the aerial application of chemicals and other substances for agricultural purposes;

(G) Aircraft certificated by the Secretary of Transportation for research and development purposes;

(H) Aircraft while used for showing compliance with regulations, crew training, exhibition, air racing, or market surveys; and

(I) Aircraft equipped to carry not more than one person.

(e) Aviation fuel standards; establishment, implementation and enforcement

The Secretary of Transportation shall prescribe, and from time to time revise, regulations (1) establishing standards governing the composition or the chemical or physical properties of any aircraft fuel or fuel additive for the purpose of controlling or eliminating aircraft emissions which the Administrator of the Environmental Protection Agency (pursuant to section 1857f–9 of title 42) determines endanger the public health or welfare, and (2) providing for the implementation and enforcement of such standards.

(Pub.L. 85–726, title VI, § 601, Aug. 23, 1958, 72 Stat. 775; Pub.L. 89–670, § 6(c)(1), Oct. 15, 1966, 80 Stat. 937; Pub.L. 91–596, § 31, Dec. 29, 1970, 84 Stat. 1619; Pub.L. 91–604, § 11(b)(1), Dec. 31, 1970, 84 Stat. 1705; Pub.L. 93–239, § 4, Jan. 2, 1974, 87 Stat. 1048.)

§ 1423. Aircraft certificates

(a) Authorization to issue; application; investigation; tests; issuance of type certificate

(1) The Secretary of Transportation is empowered to issue type certificates for aircraft, aircraft engines, and propellers; to specify in regulations the appliances for which the issuance of type certificates is reasonably required in the interest of safety; and to issue such certificates for appliances so specified.

(2) Any interested person may file with the Secretary of Transportation an application for a type certificate for an aircraft, aircraft engine propeller, or appliance specified in regulations under paragraph (1) of this subsection. Upon receipt of an application, the Secretary of Transportation shall make an investigation thereof and may hold hearings thereon. The Secretary of Transportation shall make, or require the applicant to make, such tests during manufacture and upon completion as the Secretary of Transportation deems reasonably necessary in the interest of safety, including flight tests and tests of raw materials or any part or appurtenance of such aircraft, aircraft engine, propeller, or appliance. If the Secretary of Transportation finds that such aircraft, aircraft engine, propeller, or appliance is of proper design, material, specification, construction, and performance for safe operation, and meets the minimum standards, rules, and regulations prescribed by the Secretary of Transportation, he shall issue a type certificate therefor. The Secretary of Transportation may prescribe in any such certificate the duration thereof and such other terms, conditions, and limitations as are required in the interest of safety. The Secretary of Transportation may record upon any certificate issued for aircraft, aircraft engines, or propellers, a numerical determination of all of the essential factors relative to the performance of the aircraft, aircraft engine, or propeller for which the certificate is issued.

(b) Production certificates

Upon application, and if it satisfactorily appears to the Secretary of Transportation that duplicates of any aircraft, aircraft engine, propeller, or appliance for which a type certificate has been issued will conform to such certificate, the Secretary of Transportation shall issue a production of certificate authorizing the production of duplicates of such aircraft, aircraft engines, propellers, or appliances. The Secretary of Transportation shall make such inspection and may require such tests of any aircraft, aircraft engine, propeller, or appliance manufactured under a production certificate as may be necessary to assure manufacture of each unit in conformity with the type certificate or any amendment or modification thereof. The Secretary of Transportation may prescribe in any such production certificate the duration thereof and such other terms, conditions, and limitations as are required in the interest of safety.

(c) Airworthiness certificates

The registered owner of any aircraft may file with the Secretary of Transportation an application for an airworthiness certificate for such aircraft. If the Secretary of Transportation finds that the aircraft conforms to the type certificate therefor, and, after inspection, that the aircraft is in condition for safe operation, he shall issue an airworthiness certificate. The Secretary of Transportation may prescribe in such certificate the duration of such certificate, the type of service for which the aircraft may be used, and such other terms, conditions, and limitations, as are required in the interest of safety.

the Administrator general rulemaking authority "to exercise and perform his powers and duties," and section 1421 imposes upon him the duty to promote "safety of flight of civil aircraft in air commerce" by prescribing minimum safety standards such as those contemplated by the Chicago Convention and its Annex 8. Only section 1423 deals expressly with airworthiness certificates, and we agree with *amicus* Northwest Airlines that the Administrator's authority to issue such certificates under section 1423 extends only to United States-registered aircraft. Moreover, none of these sections overrides section 1502 which commands the Administrator to exercise his powers and perform his duties consistently with all international agreements to which the United States is a party. When the Federal Aviation Act of 1958 was enacted in 1958 the United States had already ratified the Chicago Convention and the certificate system under the Convention had been in operation for more than ten years. We believe that in section 1502 Congress commanded the Administrator to respect that system, and we reject the suggestion that Congress granted the Administrator the authority to override section 1502 by invoking the generalized language of other sections of the Act.

## IV. CONCLUSION

For the foregoing reasons we conclude that the Administrator's action in issuing SFAR 40 violated various multilateral and bilateral civil aviation agreements, which in turn violated section 1502 of the Federal Aviation Act of 1958. Accordingly, that action must be set aside under 49 U.S.C. § 1486(d) (1976).[10]

*So ordered.*

Each such certificate shall be registered by the Secretary of Transportation and shall set forth such information as the Secretary of Transportation may deem advisable. The certificate number, or such other individual designation as may be required by the Secretary of Transportation, shall be displayed upon each aircraft in accordance with regulations prescribed by the Secretary of Transportation.

(Pub.L. 85–726, title VI, § 603, Aug. 23, 1958, 72 Stat. 776; Pub.L. 89–670, § 6(c)(1), Oct. 15, 1966, 80 Stat. 937.)

10. In view of our disposition of the case we need not reach issues raised by petitioner British Caledonian Airways based on the Administrative Procedure Act and the Fifth Amendment to the Constitution.