# Legal Obligations of the United States Under Article 33 of the Refugee Convention

Article 33 of the 1951 United Nations Convention Relating to the Status of Refugees does not impose any domestic legal obligations on the United States with respect to individuals interdicted outside its territory as part of an effort to control mass illegal migration to the United States.

December 12, 1991

MEMORANDUM OPINION FOR THE LEGAL ADVISER
DEPARTMENT OF STATE

We have reviewed your letter opinion dated December 11, 1991, in which you conclude that Article 33 of the 1951 United Nations Convention Relating to the Status of Refugees ("Refugee Convention") does not impose any domestic legal obligations on the United States with respect to individuals interdicted outside its territory as part of an effort to control mass illegal migration to the United States. Letter for Timothy E. Flanigan, Acting Assistant Attorney General, Office of Legal Counsel, from Edwin D. Williamson (Dec. 11, 1991) ("Williamson Letter"). For the reasons outlined in your letter and for the additional reasons discussed below, we concur in your conclusion.*

The United States adheres to Articles 2 through 34 of the Refugee Convention by virtue of the Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223 ("the Protocol"), to which the United States acceded on November 1, 1968. The official English version of Article 33 provides in part:

> No Contracting State shall expel or return ("refouler") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.

19 U.S.T. at 6276. Article 33 thus imposes an obligation on the contracting

---

\* Editor's Note: Subsequent to the date of this opinion, the Supreme Court reached the same conclusion as this opinion in *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155 (1993).

parties not to "expel or return ("refouler")" refugees under certain circumstances.

The word "expel" in Article 33 clearly refers to the treatment to be afforded potential refugees found within a state's territory. Paragraph 1 also uses the word "return," followed by the French term "refouler." As you note in your letter, the history behind the insertion of "refouler" in the Convention demonstrates that the representatives of the nations that negotiated the Convention intended that the English word "return" not be construed so as to make the treaty applicable to persons outside the territory of a contracting state. Williamson Letter at 3-5.[1] Because both "expel" and "return ("refouler")" refer only to the treatment to be afforded individuals found within the territory of a contracting state, the Refugee Convention and the Protocol do not impose any legal obligation with respect to individuals interdicted outside the United States.

The Supreme Court, in its review of the legislative history of the United States' accession to the Protocol, has also observed that the United States acceded to Article 33 based upon the view that Article 33 could be implemented through the then-existing section 243(h) of the Immigration and Nationality Act, 8 U.S.C. § 1253(h) (1976 ed.), and that section 243(h) applied *only* to deportation of refugees already in the United States. *See INS v. Stevic,* 467 U.S. 407, 415, 417-18 (1984). The legislative history of the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, supports this view of Article 33: the House Committee Report states that the Refugee Convention was intended to "insure fair and humane treatment for refugees *within the territory of the contracting states*." H.R. Rep. No. 608, 96th Cong., 1st Sess. 17 (1979) (emphasis added).

Judge Edwards in *Haitian Refugee Center v. Gracey,* 809 F.2d 794 (D.C. Cir. 1987), concluded uneqivocally — and with specific reference to the Haitian interdiction program at issue here — that "Article 33 in and of itself provides no rights to aliens outside a host country's borders." *Id.* at 840 (Edwards, J., dissenting in part and concurring in part). The other two judges on the panel decided that the plaintiff lacked standing to challenge the interdiction program and decided the case on that ground, a decision from which Judge Edwards dissented. Neither of the judges in the majority, however, expressed any disagreement with or reservations about Judge Edwards' analysis of the underlying merits issues, including his discussion of Article 33 and his conclusion that it provides no rights to aliens outside a state's borders.

We note, moreover, as an independent ground for our conclusion, that the Protocol by which the United States adhered to the Convention is not self-executing for domestic law purposes. Accordingly, the Protocol itself does not create rights or duties that can be enforced by a court.

---

[1] Your Department has also formally communicated to Congress its view that Article 33 extends only to persons who have gained entry into a territory of a contracting state. *Haitian Detention and Interdiction: Hearing Before the Subcomm. on Immigration, Refugees, and International Law of the House Comm. on the Judiciary,* 101st Cong., 1st Sess 36-43 (1989) (statement of Alan J. Kreczko, Deputy Legal Adviser, Department of State).

Under the Supremacy Clause of the Constitution, treaties made pursuant to the Constitution's procedures are part of the "supreme Law of the Land . . . ." U.S. Const. art. VI, cl. 2. Some treaties, however, merely impose obligations under international law that the United States, as a contracting party, must perform particular acts, without themselves creating any obligations under domestic law. In such cases the international obligation must be "executed" through domestic legislation before the obligation becomes effectively the law of the land. Thus, in *Foster v. Neilson*, 27 U.S. (2 Pet.) 253, 314 (1829), Chief Justice Marshall recognized that not all treaties are self-executing:

> [A treaty] is, consequently, to be regarded in courts of justice as equivalent to an act of the legislature, whenever it operates of itself without the aid of any legislative provision. But when the terms of the stipulation import a contract, when either of the parties engages to perform a particular act, the treaty addresses itself to the political, not the judicial department; and the legislature must execute the contract before it can become a rule for the Court.

*See also* Memorandum for Michael J. Matheson, Deputy Legal Adviser, Department of State, from Ralph W. Tarr, Acting Assistant Attorney General, Office of Legal Counsel at 4-5 (Mar. 19, 1985) ("Tarr Memorandum").

Whether a treaty is self-executing is controlled by the intent of the United States as a contracting party. *See British Caledonian Airways Ltd. v. Bond*, 665 F.2d 1153, 1160 (D.C. Cir. 1981); *United States v. Postal*, 589 F.2d 862, 876 (5th Cir.), *cert. denied*, 444 U.S. 832 (1979); *Diggs v. Richardson*, 555 F.2d 848, 851 (D.C. Cir. 1976). "The parties' intent may be apparent from the language of the treaty, or, if the language is ambiguous, it may be divined from the circumstances surrounding the treaty's promulgation." *Postal*, 589 F.2d at 876.

The language of the Protocol by which the United States adhered to the Refugee Convention demonstrates that the United States did not intend that the Convention, as adhered to, would be self-executing. In particular, Article III of the Protocol provides that the signatories are to communicate to the United Nations the "laws and regulations which they may adopt to ensure the application of the present Protocol." 19 U.S.T. at 6226. *Cf. Postal*, 589 F.2d at 876-77 (treaties that "expressly provide for legislative execution" are "uniformly declared executory" and therefore require further legislative action to bring the treaty into effect). Moreover, such a provision would have been unnecessary if the Refugee Convention were self-executing. *Cf.* Protocol, art. VI(b), 19 U.S.T. at 6227 (any signatory with federal form of government obligated to bring the articles of Refugee convention to

the notice of the constituent states if those articles come within the states' exclusive legislative jurisdictions). Thus, the Protocol by its own terms plainly contemplates the need for implementing legislation by its signatories.

Furthermore, the understanding of the President and the Senate in adopting the Protocol was that the United States' obligations under the Refugee Convention, pursuant to the Protocol, would not be self-executing. Specifically, the President and Senate clearly believed that pre-existing domestic law governing refugees — which applied only to persons already in the United States — would suffice to implement the Refugee Convention and the Protocol.[2] *See also Stevic,* 467 U.S. at 417-18. We also note that the Second Circuit, the only circuit court to address the question directly has concluded that the Protocol is not self-executing. *Bertraud v. Sava,* 684 F.2d 204, 218-19 (2d Cir. 1982).

Because the Protocol is not self-executing, its provisions cannot be enforced by a private right of action in a United States court.[3] It is well-established that individuals may directly seek enforcement of a treaty's provisions only when "the treaty . . . expressly or impliedly provides a private right of action." *Tel-Oren v. Libyan Arab Republic,* 726 F.2d 774, 808 (D.C. Cir. 1984) (Bork, J., concurring), *cert. denied,* 470 U.S. 1003 (1985). *See also Head Money Cases,* 112 U.S. 580, 598-99 (1884); *Frolova v. Union of Soviet Socialist Republics,* 761 F.2d 370, 373 (7th Cir. 1985) ("if not implemented by appropriate legislation [treaties] do not provide the basis for a private lawsuit unless they are intended to be self-executing"); *Mannington Mills, Inc. v. Congoleum Corp.,* 595 F.2d 1287, 1298 (3d Cir. 1979); *Linder v. Calero Portocarrero,* 747 F. Supp. 1452, 1462-63 (S.D. Fla. 1990); *Haitian Refugee Cent. Inc. v. Gracey,* 600 F. Supp. 1396, 1405-06 (D.D.C. 1985), *aff'd on other grounds,* 809 F.2d 794 (D.C. Cir. 1987).

A one-page opinion of this Office, and one sentence in another Office of Legal Counsel opinion, might be read to suggest that refugees interdicted on the high seas enjoy certain rights under the Protocol adopting the Refugee Convention. *See Proposed Interdiction of Haitian Flag Vessels,* 5 Op. O.L.C. 242, 248 (1981) ("Individuals who claim that they will be persecuted . . . must be given an opportunity to substantiate their claims [under Article 33]."); Memorandum for the Associate Attorney General from Larry L. Simms, Deputy Assistant Attorney General, Office of Legal Counsel (Aug. 5, 1981) ("Those who claim to be refugees must be given a chance to substantiate

---

[2] *See, e.g.,* S. Exec. Doc K, 90th Cong., 2d Sess. III (1968) (message from Pres. Johnson) ("most refugees in this country already enjoy the protection and rights which the Protocol seeks to secure for refugees in all countries"); *id.* at VIII (report of secretary of State Rusk) ("[Article 33] is comparable to Section 243(h) of the Immigration and Nationality Act . . . and it can be *implemented* within the administrative discretion provided by existing regulations") (emphasis added); S. Exec. Rep. No. 14, 90th Cong., 2d Sess. 4 (1968) (testimony of Laurence A. Dawson, State Dept. official) ("refugees in the United States have long enjoyed the protection and the rights which the protocol calls for").

[3] Of course, even were the Protocol deemed to be self-executing, the Protocol would need to be examined to see if it conferred any legally enforceable rights upon individuals interdicted outside the territory of the United States. *See also* Tarr Memorandum at 4 n.5. We have already concluded above that the Protocol does not confer any legally enforceable rights upon such individuals.

89

their claims [under Article 33]."). Among other things, those memoranda did not address whether the Protocol adopting the Refugee Convention is self-executing. To the extent that those memoranda could be read to suggest that Article 33, as adopted by the Protocol, imposes a judicially enforceable obligation on the United States with respect to individuals interdicted beyond its territorial boundaries, those memoranda are incorrect.

TIMOTHY E. FLANIGAN
*Acting Assistant Attorney General*
*Office of Legal Counsel*