### UNITED STATES of America

### v.

### Jack TERRELL, et al., Defendants.

### No. 88–6097–Cr.

United States District Court,
S.D. Florida.

July 12, 1989.

Eric Dubelier, Asst. U.S. Atty., Miami, Fla., for plaintiff.

Nurik & Kyle, John Howes, Ft. Lauderdale, Fla., E. Joseph Ryan, Jr., Miami, Fla., Carlos L. De Zayas, No. Miami Beach, Fla., Joseph Portuondo, Miami, Fla., G. Douglas Jones, Birmingham, Ala. and John C. Mattes, Miami, Fla., for defendants.

## ORDER ON MOTIONS TO DISMISS

ROETTGER, District Judge.

THIS CAUSE is before the Court on Motion of Defendants, Jack Terrell, Thomas Posey, Mario Calero, Maco Stewart, Jose Coutin, and Alex Martinez, to dismiss Counts I and II of the indictment; and on Motion of Defendant, Jack Terrell, to dismiss Counts V and VI of the indictment.[1]

Upon consideration of the record in this cause, and after hearing, the Court finds as follows:

Counts I and II charge all defendants with conspiracy to violate and violation,

---

1. The remaining counts in this indictment are: Counts III and IV, which charge Defendant, Jack Terrell, with violating 18 U.S.C. § 922; and Count VII, which charges Defendant, Jose Coutin, with violating 18 U.S.C. § 1544. These three (3) counts are not at issue in the instant Motion to Dismiss.

respectively, of 18 U.S.C. § 960 (the Neutrality Act), which provides in pertinent part as follows:

18 U.S.C. sec. 960. Expedition against friendly nation

Whoever, within the United States, knowingly begins or sets on foot or provides a means for or furnishes the money for, or takes part in, any military or naval expedition or enterprise to be carried on from thence against the territory or dominion of any foreign prince or state, or of any colony, district, or people with whom the United States is at peace, shall be fined ... or imprisoned ... or both.

Counts V and VI charge Defendant, Jack Terrell, with shipping and transporting a firearm, and carrying same said firearm, respectively, while violating the Neutrality Act.

Defendants assert that Counts I, II, V, and VI must be dismissed because the United States was not "at peace" with Nicaragua at the time of the offenses alleged in the indictment, and thus the Government has failed to state a crime against DEFENDANTS. The time-frame covered by the indictment spans five and one-half (5½) months, from October, 1984, through mid-March, 1985.

The Government responds that whether the United States was "at peace" with Nicaragua between October, 1984, and March, 1985, is a question of fact, a matter of the sufficiency of the Government's proof, and an inappropriate issue for a Motion to Dismiss. Alternatively, the Government asserted at oral argument[2] that the United States *was* "at peace" with Nicaragua during the time alleged in the indictment, and that Defendants' Motion to Dismiss should be denied on its merits.

This court has previously found that the question whether the United States was "at peace" with Nicaragua during the time alleged in the indictment is not a question of the sufficiency of the Government's proof but is rather a question of law. However, to avoid the prospect of a lengthy trial in the event Defendants' Motion to dismiss is valid, the court held an evidentiary hearing. For the reasons stated below, the court also finds that the United States was not "at peace" with Nicaragua from October, 1984, through March, 1985, and that Counts I, II, V, and VI must be dismissed.

*Facts*

Defendants' pleadings chronicle the extensive history of American involvement in Nicaragua and allege that this history demonstrates that the United States was not "at peace" with Nicaragua during the time alleged in the indictment. In brief, DEFENDANTS' evidence showed the following:

(1) In December, 1981, President Ronald Reagan authorized a Central Intelligence Agency (CIA) covert program in support of the Contras,[3] and signed into law a Congressional Authorization for nineteen (19) million dollars in military assistance to the Contras; said presidential and Congressional actions were based in part on the belief that the Sandinista government of Nicaragua was involved in insurgency in other Central American nations;

(2) Throughout 1982 the CIA planned and/or assisted in carrying out various military operations inside Nicaragua directed against the Sandinista government and/or the flow of arms from Nicaragua to other Central American nations;

(3) In July, 1983, President Reagan directed the Defense Department (Defense) to provide increased support to the Contras, and the CIA in turn requested of Defense twenty-eight (28) million dollars in military equipment;

(4) In December, 1983, following growing Congressional criticism of the CIA's 28 million dollar request, Congress

---

**2.** The Government's pleading filed in response to Defendants' Motion to Dismiss did not address the merits of Defendants' Motion. The court treats the Government's argument at hearing as an amendment of and alternative ground to the Government's filed Response.

**3.** The term "Contras," as used throughout this Order, is a short form of reference to the paramilitary group of Nicaraguans engaged in armed opposition to the Sandinista government.

agreed to cap the CIA's requested equipment at twenty-four (24) million dollars;

(5) In January, 1984, President Reagan and the National Security Council (NSC), in the face of continued Congressional criticism and concerned that Congress might further limit or cut off funds to the Contra cause, agreed that CIA covert activities in Nicaragua should be intensified;

(6) In the Spring of 1984, following public disclosure and criticism of United States' involvement in the mining of Nicaragua's harbors, and increasingly concerned that Congress would cut off all funding to the Contras, the executive branch began seeking funds for the Contra cause from third-party sources, including foreign countries;

(7) On October 1, 1984 Congress passed the Boland Amendment II (Boland II), cutting off all Congressional funding to the Contras until at least February 28, 1985,

(8) In the Fall and Winter of 1984 members of the executive branch continued aiding the Contras, via third-party funding and using various executive branch personnel to channel the funds to secret bank accounts,

(9) By the summer of 1985 Congress resumed aid to the Contras, in the form of twenty-seven (27) million dollars for nonlethal purposes,

(10) In 1986 Congress approved one hundred (100) million dollars in Contra aid.

Adolfo Calero, director of Nicaraguan Resistance, testified that in the Spring of 1984 the Contras were visited by CIA agents, NSC members, and Oliver North. These visitors informed the Contras that President Reagan would continue to solicit money and support for the Contras. The Contras were also told that the Contras should not give up the fight. To achieve this goal of continuation of Contra resistance to the Sandinistas by third-party funding Calero was instructed by Oliver North and others to establish secret bank accounts.

Calero testified that between October, 1984, and March, 1985, the Contras received approximately twenty-nine (29) million dollars from the secret transactions involving Oliver North as liaison, about one-third (⅓) of which was used by the Contras to buy arms. Calero also testified that the Contra war against the Sandinistas continued at the same level of combat after Boland II as before.

Calero testified that, prior to October, 1984, American military personnel visited Contra training camps, and Contra commanders trained in the United States. Further, the Government stipulated that during the time period alleged in the indictment U.S. military equipment was used by the Contras in Nicaragua.

*Law*

The Neutrality Act was passed in 1794, and has since undergone little change in wording. There is no law on the meaning of the term "at peace." The term "neutrality", a similar term, was defined by the Supreme Court in 1897 as "consisting in abstinence from any participation in a public, private, or civil war, and in impartiality of conduct towards both parties." *United States v. The Three Friends*, 166 U.S. 1, 52, 17 S.Ct. 495, 498, 41 L.Ed. 897, 914 (1896).

Defendants assert that "at peace" must mean more than the mere absence of a formal declaration of war. Defendants document the conflicts the United States has engaged in since World War II, all without a formal declaration of war. These conflicts include, among others, Korea and Vietnam. The court takes notice because numerous others since World War II come immediately to mind: among others, Quemoy and Matsu in the mid–1950's; Lebanon in 1958; Grenada in the mid–1980's; the raid on Tripoli, Libya, in April, 1986; and the Persian Gulf in the late 1980's. Defendants assert that the United States was not "at peace" with the various nations involved in these conflicts, even though there were never formal declarations of war. Similarly, Defendants argue that the United States was not "at peace" with Nicaragua at the time alleged in this indictment.

In each of the instances mentioned above, the military forces of the United States were committed and no violations of the Neutrality Act have been charged. In Vietnam the Congress did pass the "Gulf of Tonkin" Resolution and the military involvement in Korea was a United Nations response to aggression. However, in some instances the Congress wasn't even advised until the military operation was underway, e.g., the raid on Libya and invasion of Grenada, both in the mid–1980's.[4]

The court further notes that in the Spring of 1980 American military helicopters were dispatched to Iran on a raid to rescue American Hostages in the U.S. Embassy, again without prior Congressional approval. By contrast, American citizens utilized some former American military personnel to rescue other American hostages from Iran. *See* K. Follett, *On Wings of Eagles* (1983). The private action was never challenged as a violation of the Neutrality Act, possibly because of the embarrassing contrast, success-wise, between the two missions.

From evidence presented at the hearing, it appears that declarations of war between nations have become passé. For example, there have been no declarations of war since the late 1940's—not even between Iran and Iraq. In fact, there is some dispute as to whether there was a declaration of war between Israel and some of its Arab neighbors in the late '40's; if there was no declaration of war then, there has been none since the cessation of World War II.

The Government admits that the wording of the Neutrality Act presents some difficulty in these modern times of covert activities and undeclared warfare. The Government concedes that it would be inaccurate to say that the only time the United States is not "at peace" is when Congress has formally declared war. The Government does assert that the United States is "at peace" if Congress has not affirmed or ratified actions contrary to a state of peace.

In the instant case the Government asserts that, as of October 12, 1984, the effective date of Boland II, the United States was "at peace" with Nicaragua. The Government argues that, even if the United States was not "at peace" with Nicaragua prior to October 12, 1984, a state of peace existed thereafter. The Government makes this argument on the ground that Boland II demonstrated that Congress did not affirm or ratify any further activities the executive branch might have had in mind regarding the Contra cause in Nicaragua.

The Government's argument makes the date of passage of Boland II, October 12, 1984, a bright line cut-off date. The Government asserts that, even assuming that the United States was not "at peace" with Nicaragua prior to October 12, 1984, the United States was "at peace" with Nicaragua thereafter and thus any activities engaged in between October, 1984, and March, 1985, occurred at a time when the United States was "at peace" with Nicaragua.

The facts of this case simply do not support the Government's argument that peace broke out between the United States and Nicaragua on October 12, 1984. The facts, as laid out in bare-bones form in this Order, show that Boland II cut off Congressional funding to the Contras for a period of some ten (10) months, but did not stop the administration from seeking and coordinating aid for the Contras from other sources.

The facts also show that the Contras, funded in part by the executive branch, continued their attempt to overthrow the Sandinista government. The mere fact that Congress refused to fund the Contra cause for a brief period of time is not equivalent to saying that the United States was "at peace" with Nicaragua.

Assuming that the terms "at peace" and "neutrality" are synonymous, then by no stretch of the imagination can the United States be said to have been "at peace" with them.

---

**4.** These matters are so well established that the court can, and does, take judicial notice of

Nicaragua after October 12, 1984, under the *Three Friends* definition. The facts show that, although Congress may have abstained from supporting the Contras for ten months, the executive branch did not abstain. Even the Congress cannot be said to have been "impartial" towards both sides in Nicaragua, unless one views Boland II in a void, completely divorced from immediate history both past and future. Certainly, the actions of the executive branch were not "impartial."

The court finds that the history of American involvement in Nicaragua conclusively demonstrates that the United States was not "at peace" with Nicaragua during the time frame charged in the indictment. The Government would have this Court ignore the efforts of the executive branch undertaken after October 12, 1984, and before mid-summer, 1985, including the administration's efforts to generate both public and private support for the Contras; as well as ignore Congressional funding of the Contra cause both immediately before and immediately after Boland II. The government would have this court wear blinders and focus instead on the mere passage of Boland II and hold that Boland II created peace. This argument lacks common sense and is meritless.

The facts demonstrate the unceasing efforts of the executive branch to support the Contra cause, as well as Congressional support immediately before and also after Boland II. That the executive and legislative branches came into conflict regarding foreign policy is indisputable. That such conflict, and Congress' initial response to such conflict (Boland II), means that the United States was "at peace" with Nicaragua for the six months in the indictment after October 12, 1984, is absurd.

The Court finds the evidence overwhelming that the United States was not "at peace" with Nicaragua during the time charged in this indictment. Further, no evidence presented at the *ex parte*[5], *in camera* hearing contradicts this finding.

**5.** DEFENDANTS agreed to the *ex parte, in camera* hearing of certain classified information, in

WHEREFORE, and for the reasons stated, it is

ORDERED AND ADJUDGED that

1) The Motion of Defendants, Jack Terrell, Thomas Posey, Mario Calero, Maco Stewart, Jose Coutin, and Alex Martinez, to dismiss Counts I and II of the indictment is hereby GRANTED, and Counts I and II are hereby DISMISSED.

2) The Motion of Defendant, Jack Terrell, to dismiss Counts V and VI of the indictment is hereby GRANTED, and Counts V and VI are hereby DISMISSED.

DONE AND ORDERED.

order to facilitate a speedy resolution of DEFENDANTS' Motions.