**David LINDER, et al., Plaintiffs,**

**v.**

**Adolfo CALERO PORTOCARRERO, et al., Defendants.**

**No. 88–702–CIV.**

United States District Court, S.D. Florida.

Sept. 17, 1990.

---

Michael D. Ratner, Margaret Ratner, David Cole, Reed Brody, Morton Stavis, Peter Weiss, New York City, Daniel E. Jonas, Miami Beach, Fla., Margaret Winter, New York City, Jules Lobel, Professor of Law, University of Pittsburgh, Pittsburgh, Pa., Theodore M. Lieverman, Haddonfield, N.J., Michael Royce, Portland, Or., for plaintiffs.

Franklin Burt, John Kirkpatrick, Miami, Fla., for defendants.

## ORDER OF DISMISSAL

MARCUS, District Judge.

THIS CAUSE is before the Court upon Defendants' Motion to Dismiss, first filed on August 8, 1988. The Court has twice taken extensive argument concerning this difficult motion. This action now arises from a five-count Amended Complaint charging Defendants with (1) wrongful death, (2) battery, (3) intentional infliction of emotional distress, (4) violation of Article 3 of the First Geneva Convention, the Second Geneva Convention and the protocols thereto, customary international law, and other treaties and (5) civil conspiracy, in connection with the death of Benjamin Linder in the midst of civil war in Nicaragua. Because we find that Plaintiffs' claims are non-justiciable due to operation of the political question doctrine and that neither customary international law nor the Geneva Conventions provide a private right of action, Defendants' Motion to Dismiss must be and is GRANTED.

## I. BACKGROUND

At the heart of Plaintiffs' Amended Complaint is the claim that the Defendants plotted to kill Benjamin Linder as part of a conspiracy to undermine the Nicaraguan government through attacks on projects related to health care, education, agriculture and economic development. The Plaintiffs have alleged that these attacks were carried out with knowledge that foreign development workers would be present at the project sites. Amended Complaint at Para. 36–37. The actions surrounding the death of Linder are said to have occurred "pursuant to a policy, pattern, and practice of widespread torture, murder and inhuman and degrading treatment directed against civilians and development projects and perpetrated by employees and agents of [the Defendants]." Amended Complaint at Para. 58.

The Amended Complaint arises out of the death of Mr. Linder on April 28, 1987, in the El Cua region of Nicaragua. A proper understanding of this action requires a thorough review of the events surrounding the death of Linder as alleged in the

Amended Complaint.[1] Linder was an American mechanical engineer who moved to Nicaragua in August 1983. Amended Complaint at Para. 40. In December 1986, Linder moved to the El Cua region in order to aid the Nicaraguan government in the building of hydroelectric plants. Amended Complaint at Para. 46. On April 28, 1987, between 6:00 and 7:00 a.m., Linder, who was wearing civilian clothing and boots and carrying a rifle, set out with six other men for a site where a dam was being built. Some of Linder's companions were armed and wearing military uniforms. While none of the men were members of the Nicaraguan army, some were members of the civilian self-defense militia. Amended Complaint at Para. 51–52.

At about 8:00 a.m., Linder and the rest of the group arrived at the half-finished dam site. Linder proceeded to put down his rifle and sat down on a log to examine a notebook. All the other men put down their guns as well. Amended Complaint at Para. 53. Shortly after their arrival at the dam site, the group was attacked by a Nicaraguan Democratic Force ("FDN") patrol consisting of at least twelve persons, who had been positioned on high ground above the dam site awaiting the arrival of Linder and other development workers. The FDN patrol launched the attack with grenades and machine gun fire. Linder was immobilized by wounds to his legs and a bullet wound to his left arm. These wounds would not have caused Linder's death. The members of the FDN patrol proceeded to torture Linder by inflicting thirty to forty wounds to his face with a sharp pointed object. Subsequently, Linder was killed by a contra[2] who shot him in the temple from a distance of less than two feet. Amended Complaint at Para. 55.

The Plaintiffs have filed this suit as a class action pursuant to Rule 23.2 of the Federal Rules of Civil Procedure. Amended Complaint at Para. 21. The Defendants consist of three organizations, the Nicaraguan Democratic Force ("FDN"), the United Nicaraguan Opposition ("UNO") and the Nicaraguan Resistance ("RN"), as well as four individuals, Adolfo Calero Portocarrero, Enrique Bermudez Varela, Aristides Sanchez Herdocia and Indaleco Rodriguez Alaniz. The FDN and UNO, two contra organizations, merged into the RN on or about May 8, 1989. Amended Complaint at Para. 19. The Amended Complaint avers that the four individual Defendants are leaders of the contra organizations. Amended Complaint at Para. 13–16.

The Amended Complaint alleges, among other things, that Defendant Bermudez directed the FDN patrol to murder Linder with knowledge that Linder was a development worker and a United States citizen. Amended Complaint at Para. 2a, 54. It is averred that Defendants Calero, Sanchez and Rodriguez approved the attack and murder. Amended Complaint at Para 54. Moreover, the Plaintiffs further contend that upon being told of the attack on Linder, Defendant Bermudez congratulated the leader of the patrol and gave him a monetary reward. Amended Complaint at Para 55a.

Some activities in furtherance of the alleged terrorism are said to have taken place in the Southern District of Florida. Specifically, it is alleged that the FDN directorate and the civil-military command held regular meetings in the Southern District of Florida. Amended Complaint at Para. 29. It is further asserted that the individual Defendants and the FDN operated military training camps in the Southern District of Florida for the purpose of training terrorists to participate in attacks within Nicaragua. Training allegedly included instruction in attacking non-military targets such as health clinics, schools, peasant cooperatives, agricultural and construction

---

**1.** For purposes of a motion to dismiss, the Complaint is construed in a light most favorable to the Plaintiff and its allegations are taken as true. *Schever v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Johnson v. Wells,* 566 F.2d 1016 (5th Cir.1978); 5A C. Wright & A.

Miller, Federal Practice and Procedure § 1357 (2d ed.1990).

**2.** Throughout this Order, the term "Contra" is used as a reference to the anti-government forces who at the time fought in the Nicaraguan civil war.

machinery and development projects. The training camps are alleged to have been in operation from 1983 until after the attack on Linder. Amended Complaint at Para. 31. Furthermore, the Plaintiffs claim that the Defendants used funds deposited in banks within the Southern District of Florida to buy weapons within the district. The Plaintiffs also allege that the Defendants hired a Miami public relations firm and maintained offices within the Southern District of Florida. Amended Complaint at Para. 30.

The Plaintiffs premise their claims of liability upon the contention that the torture and murder of Linder were carried out by the FDN, UNO and its employees acting within the scope of their employment. Defendants Calero, Bermudez, Sanchez and Rodriguez are said to be responsible for acts of terrorism committed by their employees. Moreover, the Defendants Calero, Bermudez, Sanchez and Rodriguez and the FDN and UNO are alleged to have authorized, approved, directed and ratified the torture and execution of Benjamin Linder. In the alternative, the claim is made that the Defendants knew or should have known that members of the FDN tortured and executed wounded persons. Despite this knowledge, the Defendants allegedly failed to take steps to stop such practices.

In support of their Motion to Dismiss, Defendants raise several arguments: first, that the Court lacks subject matter jurisdiction over this action because the claims represent non-justiciable political questions; second, that the action should be dismissed under the Act of State Doctrine; third, that the Plaintiffs have failed to state a claim under customary international law; and, finally, that the Geneva Conventions do not provide a private right of action for the Defendants.[3]

■ The obvious purpose of a motion to dismiss is to test the facial sufficiency of the statement of claim for relief. And it is read along with Rule 8(a) of the Federal Rules of Civil Procedure which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." This motion is not designed to strike inartistic pleadings or to provide a more definite statement to answer an apparent ambiguity. Thus the examination of a 12(b)(6) motion is primarily limited to the face of the complaint and attachments thereto. See 5A C. Wright & A. Miller, Federal Practice and Procedure § 1356 (1990). Moreover, for the purposes of the motion to dismiss, the complaint must be construed in a light most favorable to the plaintiff and the allegations taken as true. We hasten to add that this motion is viewed with disfavor and rarely granted. See e.g., Madison v. Purdy, 410 F.2d 99, 100 (5th Cir.1969); International Erectors, Inc. v. Wilhoit Steel Erectors & Rental Service, 400 F.2d 465, 471 (5th Cir.1968) ("Dismissal of a claim on the basis of barebone pleadings is a precarious disposition with a high mortality rate.") Only a generalized statement of facts is necessary to comply with the liberal federal rules of pleading. A classic formulation of the test often applied to determine the sufficiency of the complaint was set out by the Supreme Court in Conley v. Gibson:

> In appraising the sufficiency of the complaint we follow ... the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957) (footnote omitted).

■ We add that a complaint may not be dismissed because the plaintiff's claims do not support the legal theory he relies on since the court must determine if the allegations provide for relief on any possible theory. Robertson v. Johnston, 376 F.2d 43 (5th Cir.1967). What a plaintiff must do in his complaint is to set forth sufficient facts and information to outline his claim or to permit the appropriate inferences that may be drawn from the claim. The plead-

---

**3.** The Defendants also argue that Florida law is inapplicable to this case and that unincorporated associations are not subject to suit under Florida law. While we find these arguments unpersuasive, our result renders discussion of these issues unnecessary.

ings must show, in short, that Plaintiff has no claim before the 12(b)(6) motion may be granted.

## II.  POLITICAL QUESTION DOCTRINE

■ Unlike the rules of standing, ripeness, and mootness, the political question doctrine is not drawn directly from the case or controversy focus of Article III of the Constitution. *See* 13A C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3534 (2d ed.1984). The Constitution gives no explicit support to the theory that the federal courts should not decide certain types of cases or issues based on the fact that they involve political questions. *Atlee v. Laird*, 347 F.Supp. 689, 692 (E.D.Pa. 1972) (three-judge court), *aff'd. sub nom. mem.*, *Atlee v. Richardson*, 411 U.S. 911, 93 S.Ct. 1545, 36 L.Ed.2d 304 (1973). Rather, "[t]he non-justiciability of a political question is primarily a function of the separation of powers." *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

An early recognition of the political question doctrine arose in the landmark case of *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 165–66, 2 L.Ed. 60 (1803). In *Marbury*, Chief Justice Marshall observed that the question of whether an act committed by a head of a government department is reviewable by the federal courts depends on the nature of the act. He wrote:

By the Constitution of the United States, the president is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience. To aid him in the performance of these duties, he is authorized to appoint certain officers, who act by his authority, and in conformity with his orders. In such cases, their acts are his acts; and whatever opinion may be entertained of the manner in which executive discretion may be used, still there exists, and can exist, no power to control that discretion. The subjects are political: they respect the nation, not individual rights, and being entrusted to the executive, the decision of the executive is conclusive.

*Id.* at 165–66.

The preeminent, modern-day delineation of the contours of the political question doctrine took place in *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). In *Baker*, the Supreme Court found that a Fourteenth Amendment challenge to the method of legislative apportionment employed in Tennessee presented a justiciable issue. In reaching this determination, the Court engaged in a thorough discussion of the applicability of the political question doctrine. The Court first observed that "in the Guaranty Clause cases and in other 'political question' cases, it is the relationship between the judiciary and the coordinate branches of the Federal Government, and not the federal judiciary's relationship to the States, which give rise to the 'political question.'" *Id.* at 210, 82 S.Ct. at 706. Accordingly, the Court opined that "[i]n determining whether a question falls within [the political question] category, the appropriateness under our system of government of attributing finality to the action of the political departments and also the lack of satisfactory criteria for a judicial determination are dominant considerations." *Id.* (citing, *Coleman v. Miller*, 307 U.S. 433, 454–55, 59 S.Ct. 972, 982, 83 L.Ed. 1385 (1939) (second brackets in original)).

As a means of discerning those cases which raise nonjusticiable political questions, the Court introduced the following set of standards:

Prominent on the surface of any case held to invoke a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for un-

questioning adherence to a political decision already made or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker,* 369 U.S. at 217, 82 S.Ct. at 710.

■■■ A thorough review of Plaintiffs' claim leads us to the firm conclusion that the claim is barred by the political question doctrine. In particular, we find that three indicia of political questions are squarely presented by the issues raised on the face of the Amended Complaint. First, and perhaps most important, this court can discern no judicially manageable criteria by which to adjudicate the merits of the claim. Second, the real prospect that the parties would not be able to fully gather the data necessary to adjudicate this claim on the merits also points to a finding of non-justiciability. Finally, adjudication on the merits could readily lead to real interference with the conduct of foreign policy by the political branches of government. When we consider these indicia together, we are led to the conclusion that this Motion to Dismiss must be GRANTED.

### A. *Lack of Standards for Adjudication*

In *Baker,* 369 U.S. at 217, 82 S.Ct. at 710, the Court pointed to the "lack of judicially discoverable and manageable standards for [resolution]" among its well known, six-point enumeration of political question indicia. The inclusion of the lack of satisfactory criteria for judgment as a basis for holding an issue to be political in nature is altogether consonant with the Court's traditional reluctance to adjudicate cases where decision-making criteria are absent. Indeed, as early as 1850, in the historic case of *Luther v. Borden,* 48 U.S. (7 How) 1, 12 L.Ed. 581 (1850), the Supreme Court recognized the lack of satisfactory criteria for decision as a manifest basis for refusal to adjudicate a claim on the merits.

*Luther* arose out of a political uprising which gripped Rhode Island between 1841 and 1842. The uprising, known as Dorr's rebellion, saw an insurgent group lay claim to being the official government of the state. In response to threatening actions of the insurgent group, the incumbent government, known as the "Charter" government, declared martial law and "called out the state militia to repel the threatened attack and to subdue those who were engaged in it." *Luther,* 48 U.S. at 37. Pursuant to their positions as members of the Charter government militia, the defendants invaded the plaintiff's house in order to arrest the plaintiff who was believed to be a leader of the insurrection. The plaintiff proceeded to bring a trespass action against the defendants for damages suffered in the course of the invasion. The defense to the action consisted of the claim that the invasion was justified by the duty to enforce the orders of the Charter government. In turn, the plaintiffs argued that a constitution approved by a majority of the Rhode Island electorate had established the insurgents as the legitimate government of Rhode Island. Consequently, according to the plaintiffs, the defendants had no legal authority to conduct the invasion of the plaintiff's residence. The plaintiffs' right of recovery directly turned upon the determination of which faction was entitled to recognition as the legitimate government of Rhode Island.

In upholding the Circuit Court's refusal to adjudicate the question of which group represented the legitimate government of the state, the Supreme Court rejected the plaintiff's claim that Article IV, Section 4 of the Constitution—which guarantees every state in the union a republican form of government—required the Court to determine which of the putative governments represented the legitimate government of Rhode Island. The Court found that:

Under this Article of the Constitution it rests with Congress to decide what government is the established one in a State. For as the United States guarantee(s) to each State a republican government, Congress must necessarily decide what government is established in the state before it can determine whether it is republican or not.

*Luther,* 48 U.S. at 42 (footnote omitted). The Court refused to determine which of

the groups represented the legitimate government.

The Supreme Court acknowledged that "the courts of the United States have certain powers under the Constitution and laws of the United States which do not belong to the state courts." *Id.* at 40. However, it observed that "the power of determining that a State government has been lawfully established, which the courts of the state disown and repudiate, is not one of them." *Id.* The Court went on to write:

Besides, if the Circuit Court had entered upon this inquiry by what rule could it have been determined the qualifications of voters upon the adoption or rejection of the proposed constitution, unless there was some previous law of the State to guide it? It is the province of a court to expound the law, not to make it. And certainly it is no part of the judicial functions of any of the United States to prescribe the qualification of voters in a State, giving the right to those whom it is denied by the written and established constitution and laws of the state, or taking it away from those to whom it is given; nor has it the right to determine what political privileges the citizens of a State are entitled to, unless there is an established constitution or law to govern its decision.

*Id.* at 41. In essence, the Court found that neither a law nor a constitutional provision provided the necessary criteria by which to decide which faction had been properly elected to govern Rhode Island, and, in the absence of criteria for such a decision, the Court found it could not properly adjudicate the merits of the issue.

The case of *Coleman v. Miller*, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939), also underscores the importance of judicially discoverable and manageable standards. *Coleman* arose out of the State of Kansas' approval in January 1937 of the proposed Child Labor Amendment to the Constitution, which the United States Congress had proposed in June 1924. A suit seeking a writ of mandamus to have the approval declared void was brought by twenty-one members of the Kansas Senate in the Su-

preme Court of Kansas. The petitioners contended, among other things, that the proposed amendment had lost its vitality because the amendment had not been approved by the requisite number of states within a reasonable amount of time. The Supreme Court of Kansas denied the writ of mandamus and certiorari was granted directly by the Supreme Court.

In upholding the denial of the writ by the Supreme Court of Kansas, the Court refused to decide the issue of whether the proposed amendment had lost its vitality due to the long period of time between proposal by Congress in 1924 and approval by the Kansas legislature in 1937. *Coleman*, 307 U.S. at 451–56, 59 S.Ct. at 981–83. The Court found the proposed amendment to contain no provision specifying a limitation upon the time during which the proposed Amendment would remain viable. While holding that Congress clearly has the authority to fix a time limit for ratification, the Court observed that where Congress has not done so, it does not fall within the province of the Court to determine a reasonable amount of time for the proposed amendment to remain viable.

Paramount among the Court's reasons for its refusal to determine the issue was the lack of criteria for making such a determination. In this regard the Court asked, "Where are to be found the criteria for such a judicial determination? None are to be found in Constitution or in statute." *Id.* at 453, 59 S.Ct. at 981. The Court observed:

In determining whether a question falls within that category [of political questions], the appropriateness under our system of government of attributing finality to the action of the political departments and also the lack of satisfactory criteria for a judicial determination are dominant considerations.

*Id.* at 454–55, 59 S.Ct. at 982 (citations omitted).

In the instant case, Plaintiffs have set forth several possible sources of law for this Court to apply in determining whether the actions of the Defendants were tor-

tious. The proposed sources consist of three groups of decision-making criterium: (1) Florida tort law, both statutory and common law; (2) customary international law; (3) the Geneva Conventions. A close analysis of each of these criteria indicates that none of the three provide a judicially manageable basis for decision-making which may be employed in a United States court to adjudicate this action on the merits. Thus, we believe, we are left with no judicially discoverable criteria to resolve the serious issues raised by the claim.

1. Florida Tort Law

Of the five counts in the Amended Complaint, all except Count IV seek relief based on the application of Florida tort law to the events complained of. Count I seeks damages for wrongful death; Count II seeks damages for battery committed upon Benjamin Linder; Count III sounds in claims of intentional infliction of emotional distress brought upon both Benjamin Linder and his family; and finally, Count V seeks damages for the tort of civil conspiracy.

The Plaintiffs seek damages through the Florida Wrongful Death Act and the Florida Survivor Statute, as well as under the common law tort of civil conspiracy. An important commonality involving both statutory causes of action under the Florida Wrongful Death Act, Fla.Stat. § 768.19,[4] and the Florida Survivor Statute, Fla.Stat. § 46.021,[5] as well as the Florida common law tort of civil conspiracy, is that all three actions must be based on a cognizable underlying tort. *See,* Fla.Jur.2d Death § 14; *Duval v. Hunt,* 34 Fla. 85, 15 So. 876 (1894) (construing previous Wrongful Death Act to allow action only where decedent would have had cause of action if he had survived); *Metropolitan Life Co. v. McCar-*

son, 467 So.2d 277 (Fla.1985) (holding that where decedent would have had no cause of action for breach of contract, Wrongful Death Act provides no right of action to estate); *Stokes v. Liberty Mutual Insurance Co.,* 213 So.2d 695 (Fla.1968) (construing predecessor statute to be derivative in nature because the representative recovers only such damages as were recoverable by his decedent); *Liappas v. Augoustis,* 47 So.2d 582 (Fla.1950) (holding an act which does not constitute a cause of action against one person not to constitute a basis for the tort of civil conspiracy); *Romero v. Compoamor Modern Dairy, Inc.,* 133 So.2d 570 (Fla. 2d DCA 1961). Under Florida law, the actions brought by the Plaintiffs are contingent upon the existence of a cause of action for the decedent if he had survived.

The Plaintiffs' Amended Complaint is based on the underlying torts of battery and intentional infliction of emotional distress. There are, however, no applicable standards which would readily permit the factfinder to thoroughly assess the Defendants' liability in this case. As a federal court sitting in diversity jurisdiction we would ordinarily apply the tort law of Florida to determine the liability of the Defendants. However, the Plaintiffs have failed to cite, and we are unaware of any instance in which Florida tort law or the tort law of any other jurisdiction has been applied to actions arising out of injuries suffered in the midst of civil war occurring on foreign soil. Nor are we able to discern judicially discoverable and manageable criteria in the Florida law of tort against which to fully measure Defendants' conduct.

The allegations contained in the Amended Complaint go far beyond the simple claim that Linder was tortiously killed

**4.** The Wrongful Death Act provides in relevant part:

> When the death of a person is caused by the wrongful act, negligence, default or breach of contract or warranty of any person .. *and the event would have entitled the person injured to maintain an action and recover damages if death had not ensued, the person ... [who] would have been liable in damages if death* had not ensued shall be liable for damages as

> specified in this act notwithstanding the death of the person injured....

Fla.Stat. § 768.19 (emphasis added).

**5.** The Florida Survivor Statute provides:

> No cause of action dies with the person. All causes of action survive and may be commenced, prosecuted and defended in the name of the person prescribed by law.

Fla.Stat. § 46.021.

through acts of the Defendants. Rather, Plaintiffs have levelled broad-based charges that the participation in acts of warfare and terror against Nicaragua constitute unlawful action. *See* Amended Complaint at Para. 32. Throughout the Amended Complaint, the Plaintiffs allege that the actions taken against Linder were part of an overall design to wage attacks on foreign development workers at development sites like hydroelectric plants as a means of terrorizing the population of Nicaragua. *See* Amended Complaint at Paras. 34, 36, 57. In order to measure Defendants' conduct, we are necessarily required to adjudge the validity of the contras' policies in Nicaragua.

In our view, the court is without discoverable and manageable standards to adjudicate the nature and methods by which the contras chose to wage war in Nicaragua. The realm of issues determinable by a court or jury with reference to Florida tort law simply does not include issues such as these arising out of conflict between belligerents in the midst of a foreign civil war. Among other things, we would be required to discern between military, quasi-military, industrial, economic and other strategic targets, and rule upon the legitimacy of targeting such sites as hydroelectric plants on Nicaraguan soil in the course of civil war. We would be called upon to inquire into whether and under what circumstances Defendants were justified in targeting such sites with knowledge that civilians, or paramilitary or military personnel would be present at the sites. Indeed, we would be called upon to discern between military or paramilitary personnel guarding a strategic dam and engineers building or maintaining such a site during time of war. In short, we would necessarily be required to measure and carefully assess the use of the tools of violence and warfare in the midst of a foreign civil war. Nothing in Florida's law of torts adequately prepares us for so daunting an undertaking. And the unambiguous teaching of *Luther v. Borden, supra, Coleman v. Miller, supra,* and *Baker v. Carr, supra,* is that in the absence of clear standards a court should be reluctant to act.

### 2. Customary International Law

The Plaintiffs also have cited customary international law as a basis for their claim in two respects: first, in Count IV of their Complaint, the Plaintiffs seek recovery based directly on the Defendants' alleged violation of customary international law against torture; second, they have suggested that customary international law should be applied to provide standards for adjudication of the tort claims arising under Florida law and contained in Counts I, II, III and V of the Amended Complaint.

Two issues are presented by the Plaintiffs' direct claim under customary international law, contained in Count IV of the Amended Complaint: first, whether this Court has jurisdiction under 28 U.S.C. § 1331 to resolve a claim under customary international law; and second, if so, whether the Plaintiffs have stated a cognizable claim for relief under international law. We conclude that the court does not have jurisdiction to hear this claim under 28 U.S.C. § 1331. Furthermore, even assuming that we had the power to hear the claim, the Plaintiffs have failed to state a cognizable basis for relief under international law.

In order to have the power to hear the Plaintiffs' claim under customary international law, the claim must "arise under" the "laws of the United States." The Plaintiffs point to the fact that international law is part of the common law of the United States. "This proposition is unexceptional." *Tel–Oren v. Libyan Arab Republic,* 726 F.2d 774, 810 (D.C.Cir.1984) (Bork J. concurring) (citing *The Paquete Habana,* 175 U.S. 677, 20 S.Ct. 290, 44 L.Ed. 320 (1900); *United States v. Smith,* 18 U.S. (5 Wheat.) 153, 5 L.Ed. 57 (1820)); *Handel v. Artukovic,* 601 F.Supp. 1421, 1426 (C.D.Cal.1985). The fact that the law of nations is part of United States common law does not dictate that this claim "arises under" the "laws of the United States." "To say that international law is part of federal common law is to say only that it is nonstatutory and nonconstitutional law to be applied, in appropriate cases, in munici-

pal courts. It is not to say that, like the common law of contract and tort, for example, by itself affords individuals the right to ask for judicial relief." *Tel–Oren,* 726 F.2d at 811.

The Plaintiffs, however, rely upon *Filartiga v. Pena–Irala,* 630 F.2d 876 (2d Cir. 1980). In *Filartiga,* citizens of Paraguay brought suit against a Paraguayan government official in the United States District Court for the Eastern District of New York. The suit alleged that the official had wrongfully caused the death of their son through the use of torture. Jurisdiction was claimed under the general federal question provision, 28 U.S.C. § 1331, and under the Alien Tort Statute, 28 U.S.C. § 1350. Section 1350 provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." The district court dismissed the action for lack of subject matter jurisdiction. The Second Circuit reversed the dismissal finding that the complaint stated a violation of the law of nations and that § 1350 provides a cause of action for tort where an alien can demonstrate that a violation of international law has occurred. *Id.* at 887.

In contrast to *Filartiga,* the case at bar presents a claim for the violation of international law brought by non-aliens. Thus, jurisdiction manifestly may not rest on § 1350, which is limited on its face to actions brought by aliens. Rather, this action is brought under § 1331, which requires that the cause of action "arises under" the "laws of the United States." Therefore, unlike *Filartiga,* where § 1350 itself was held to specifically provide a cause of action where a violation of the law of nations was alleged, the Plaintiffs in the instant case must not only allege a violation of international law but must also show that international law unambiguously provides a cause of action for their claim. *See Handel,* 601 F.Supp. at 1426–27; *Tel–Oren,* 726 F.2d at 779 (Edwards J. concurring).

Because § 1331 does not provide subject matter jurisdiction for claims which violate international law, it must be determined whether international law itself provides a cause of action in an American court for private claims of torture arising during the course of a civil war on foreign soil. The principles of customary international law become law through "general assent of civilized nations." *The Paquete Habana,* 175 U.S. at 694, 20 S.Ct. at 297. Unlike treaties and statutes, such law is not authoritatively pronounced in a written document, but rather must be found in "the customs and usages of civilized nations as evidenced by jurists and commentators." *Tel–Oren,* 726 F.2d at 816 (Bork J. concurring) (quoting *The Paquete Habana,* 175 U.S. at 700, 20 S.Ct. at 299). "Consequently, any cause of action that might exist ... must be inferred from the sources that are evidence of and attempt to formulate legal rules." *Id.*

The law of nations is primarily concerned with the law between States. *Tel–Oren,* at 817 (Bork J. concurring) (citing L. Openheim, International Law: A Treatise 636 (H. Lauterpacht 8th ed.1955)). Rights under international common law belong to sovereign nations, not to individuals. *United States v. Williams,* 617 F.2d 1063, 1090 (5th Cir.1980) *(en banc).* Judge Bork in *Tel–Oren* observed that:

> International law typically does not authorize individuals to vindicate rights by bringing actions in either international or municipal tribunals. " 'Like a general treaty, the law of nations has been held not to be self-executing so as to vest a plaintiff with individual rights.' " "[T]he usual method for an individual to seek relief is to exhaust local remedies and then repair to the executive authorities of his own state to persuade them to champion his claim in diplomacy or before an international tribunal."

*Tel–Oren,* 726 F.2d at 817 (Bork J. concurring) (citations omitted).

Because § 1331 provides jurisdiction only for suits which "arise under" the "laws of the United States," this Court lacks jurisdiction to hear cases which arise out of violations of international law, unless international law itself provides a cause of ac-

tion for the given violation. But even if the Plaintiffs' claim under customary international law was subject to the jurisdiction of this court, the Plaintiffs have failed to state a cognizable claim under international law. Torture by a non-state actor is not a violation of international law.

In *Filartiga*, 630 F.2d at 884, the Court found *official* torture to be a clear and unambiguous violation of the law of nations. Because of this finding, the Court ruled that a Paraguayan official violated customary international law by causing the wrongful death of plaintiffs' decedent through the use of torture. However, the case at bar differs from *Filartiga* in respect to the status of the parties allegedly inflicting torture. The contras are private individuals whose actions simply do not represent state action.

*Sanchez–Espinoza v. Reagan*, 770 F.2d 202 (D.C.Cir.1985), like the present case, arose out of the civil war in Nicaragua. One of the claims in that action was brought by a group of Nicaraguans seeking redress for tortious injuries which they and their families allegedly suffered at the hands of the contras. *Id.* at 205. In holding that the plaintiffs had failed to state a cognizable claim under the Alien Tort Statute, Judge (now Justice) Scalia opined that "[a]s for the law of nations—so-called 'customary international law,' arising from 'the customs and usages of civilized nations,'— we conclude that this also does not reach private, non-state conduct of this sort[.]" *Id.* at 206–07. *See also Tel–Oren*, 726 F.2d at 791–96 (Edwards J. concurring).

In accordance with our finding that customary international law does not provide the Plaintiffs with an *independent* cause of action, we also reject the notion that principles of customary international law would provide us with judicially discoverable and manageable standards for adjudication. In order to create a basis for deter-

mining this tort action, we would be required to fashion basically out of whole cloth a set of standards from some combination of Florida tort law, customary international law, the Geneva Conventions, and perhaps a multitude of other possible sources. In the absence of some instruction from the legislative branch to do so, we are unprepared and ill-equipped to enter the thicket attendant to fashioning such an amalgamation of standards.

### 3. Geneva Conventions

Finally, Count IV of the Plaintiffs' Amended Complaint presents a claim for damages resulting from the Defendants' alleged violation of Common Article 3 of The First Geneva Convention, The Second Geneva Convention and the protocols thereto.[6] Additionally, the Plaintiffs contend that principles contained in the Geneva Conventions should be applied to provide standards for adjudication of the Plaintiffs' domestic tort claims. We need only address the merits of Plaintiffs' claims under the First and Second Geneva Conventions since the United States is not a signatory to the protocols cited by the Plaintiffs. *See*, Department of State, *Treaties in Force* (1987); *Tel–Oren*, 726 F.2d at 808–09 (Bork J. concurring).

In *The Head Money Cases*, 112 U.S. 580, 598–99, 5 S.Ct. 247, 254, 28 L.Ed. 798 (1884), Justice Miller discussed the relationship between United States treaties and domestic law:

A treaty is primarily a compact between independent nations. It depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it.... But a treaty may also contain provisions which confer certain rights upon citizens or subjects of one of the nations residing in the territorial limits of the other, which partake of the nature of municipal law, and which

---

**6.** *See*, Convention relative to the protection of civilian persons in time of war. Dated at Geneva August 12, 1949; entered into force October 21, 1950; for the United States February 2, 1956. 6 UST 3516; TIAS 3365; 75 UNTS 287 ("First Geneva Convention"); Convention relative to the treatment of prisoners of war. Dated at

Geneva August 12, 1949; entered into force October 21, 1950; for the United States February 2, 1956. 6 UST 3316; TIAS 3364; 75 UNTS 135 ("Second Geneva Convention"); Protocols I and II to the Geneva Conventions of August 12, 1949, *reprinted in*, 16 Int'l.Leg.Mats. 1391, 1442 (1977).

are capable of enforcement as between private parties in the courts of the country.... A treaty, then, is a law of the land as an act of Congress is, whenever its provisions prescribe a rule by which the rights of the private citizen or subject may be determined.

A treaty will only provide a basis for the enforcement of *private rights* in domestic courts if it is self-executing—that is, if it prescribes rules by which private rights may be determined. *Foster v. Neilson*, 27 U.S. (2 Pet.) 253, 311, 7 L.Ed. 415 (1829); *United States v. Postal*, 589 F.2d 862, 875 (5th Cir.1979), *cert. denied*, 444 U.S. 832, 100 S.Ct 61, 62 L.Ed.2d 40 (1979); *Dreyfus v. Von Finck*, 534 F.2d 24, 30 (D.C.Cir. 1976). Whether an international agreement is self-executing is a matter of interpretation to be determined by the courts. *Diggs v. Richardson*, 555 F.2d 848, 851 (D.C.Cir.1976). "In determining whether a treaty is self-executing courts look to the intent of the signatory parties as manifested by the instrument, and, if the instrument is uncertain, recourse must be had to the circumstances surrounding its execution." *Id.* (citing *Sei Fujii v. State*, 38 Cal.2d 718, 721–22, 242 P.2d 617, 620 (1952)).

Courts which have considered the issue have almost uniformly determined that the Geneva Conventions are not self-executing. *See Tel–Oren*, 726 F.2d at 808–09 (Bork J. concurring); *Handel v. Artukovic*, 601 F.Supp. 1421, 1425 (C.D.Ca.1985); *Huynh Thi Anh v. Levi*, 586 F.2d 625, 629 (6th Cir.1978) (First Geneva Convention not self-executing). In *Tel–Oren*, Judge Bork cited the well-established rule that "[a] treaty that provides that party states will take measures through their own laws to enforce its provisions evidences its intent not to be self-executing." *Tel–Oren*, 726 F.2d at 809 (Bork J. concurring) (citing *Foster v. Neilson*, 27 U.S. (2 Pet.) at 311–14, 7 L.Ed. 415); *United States v. Postal*, 589 F.2d 862, 876–77 (5th Cir.), *cert. denied*, 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 40 (1979). *See also Handel*, 601 F.Supp. at 1425. The Geneva Conventions expressly call for implementing legislation, and therefore the First and Second Geneva Conventions are

not self-executing. *Tel–Oren* at 809 (Bork J. concurring). While Plaintiffs cite commentary to the Conventions as evidence that the creation of private rights was intended, they cite no language to this effect within the agreement itself. Furthermore, the Plaintiffs fail to cite us to any case law which has held the Geneva Conventions to be self-executing. We can see no reason to find contrary to unanimous precedent on this issue.

Moreover, as with customary international law, we can see no ready basis by which to adapt and transpose principles contained in the Geneva Conventions in order to fashion standards to determine the Plaintiffs' tort claims. Again the Plaintiffs have failed to cite and we can find no authority for the proposition that the Geneva Conventions should be applied to create standards for adjudication of a domestic tort action.

Finally, even if sufficient standards for adjudication were available—and they are not—the Supreme Court long ago suggested that domestic tort actions are not appropriate remedies for injuries occurring outside the United States during conflicts between belligerents. In *La Amistad de Rues*, 18 U.S. (5 Wheat.) 385, 5 L.Ed. 115 (1816), an action was brought by the owners of a Spanish ship for damages resulting from the seizure of the ship on the high seas by a Venezuelan privateer during a conflict between Spain and Venezuela. The Plaintiffs' jurisdictional claim was premised on the allegation that the crew of the privateer had been augmented in the United States, thus necessitating the application of United States' jurisdiction in order to vindicate the neutrality of the nation. In reversing the district court's award of damages to the Spanish owners, Justice Story wrote:

We entirely disclaim any right to inflict such damages; and consider it no part of the duty of a neutral nation, to interpose, upon the mere footing of law of nations, to settle all rights and wrongs which may grow out of a capture between belligerents. Strictly speaking, there can be no such thing as a marine tort, be-

tween the belligerents. Each has an undoubted right to exercise all the rights of war against the other; and it cannot be a matter of judicial complaint, that they are exercised with severity, even if the parties do transcend those rules which the customary laws of war justify.

*La Amistad de Rues,* 18 U.S. at 389–90.

Years later, *Underhill v. Hernandez,* 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456 (1887) involved circumstances which were in many ways quite similar to the present case. *Underhill* arose out of the capture of a United States citizen during the Venezuelan civil war. The Plaintiff, who had been under contract to build a water system for the incumbent government, brought an action for confinement and assault against one of the parties to the civil war. In upholding the Circuit Court of Appeals' refusal to adjudicate the claim on the merits, Chief Justice Fuller wrote:

> Where a civil war prevails, that is, where the people of a country are divided into two hostile parties, who take up arms and oppose one another by military force, generally speaking foreign nations do not assume to judge of the merits of the quarrel. If the party seeking to dislodge the existing government succeeds, and the independence of the government it has set up is recognized, then the acts of such government from the commencement of its existence are regarded as those of an independent country. If the political revolt fails of success, still if actual war has been waged, acts of legitimate warfare cannot be made the basis of individual liability.

*Underhill,* 168 U.S. at 252–53, 18 S.Ct. at 84. *Underhill* and *La Amistad de Rues,* suggest that domestic tort actions historically have not been seen as a proper remedy for claims arising out of injuries sustained during foreign conflicts. Thus, even if satisfactory criteria for adjudicating this claim could somehow be found in or crafted from the amalgamation of Florida tort law, customary international law or the Geneva Conventions, Supreme Court precedent indicates that domestic tort law still would not properly be applied to the Plaintiffs' claim.

## B. *Information Gathering Problems*

Difficulty in obtaining access to relevant information also has been viewed by the Supreme Court as a basis upon which to apply the political question doctrine and decline to adjudicate the merits of an issue. In *Luther v. Borden,* 48 U.S. 1, 12 L.Ed. 581 (1798) and *Coleman v. Miller,* 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939), previously discussed in relation to lack of criteria for decision making, the Supreme Court also recognized a lack of access to information as a factor in the determination of political question. In *Luther,* the Court noted that even if the lower court had applied the existing law of Rhode Island, which confined the right of suffrage to freeholders, to govern an inquiry into which of two competing groups had been duly elected, it would have faced an enormous informational problem as an impediment to adjudication. The Court asked:

> [H]ow could the majority have been ascertained by legal evidence, such as a court of justice might lawfully receive? The written returns of the moderators and clerks of mere voluntary meetings, verified by affidavit, certainly would not be admissible; nor their opinions or judgment as to the freehold qualifications of the persons who voted. The law requires actual knowledge in the witness of the fact to which he testifies in a court of justice. How then could the majority of freeholders have been determined in a judicial proceeding?

*Luther,* 48 U.S. at 41.

In *Coleman v. Miller,* 307 U.S. at 453–54, 59 S.Ct. at 982, the Supreme Court expressed similar concerns. After discussing the various factors which would be relevant in determining a reasonable time for a proposed amendment to remain viable, the Court expressed the following view:

> In short the question of a reasonable time in many cases would involve, as in this case it does involve, an appraisal of a great variety of relevant conditions, political, social and economic, which can hardly be said to be within the appropriate

range of evidence receivable in a court of justice and as to which it would be an extravagant extension of judicial authority to assert judicial notice as the basis of deciding a controversy with respect to the validity of an amendment actually ratified. On the other hand, these conditions are appropriate for the consideration of the political departments of the Government. The questions they involve are essentially political and not justiciable. They can be decided by the Congress with the full knowledge and appreciation ascribed to the national legislature of the political, social and economic conditions which have prevailed during the period since the submission of the amendment.

*Coleman,* 307 U.S. at 453–54, 59 S.Ct. at 982.

A limitation on access to relevant information is a particularly serious impediment to the adjudication of issues touching on foreign relations. Professor Scharpf has written in this connection:

To the extent that a decision would depend upon the evaluation of a fact-situation abroad, the Court's means of gathering the relevant data would seem to be much inferior to those of the executive, particularly when such questions arise, as they often do, in suits between domestic private parties. It does not seem unreasonable, therefore, that the Court often accepts without further investigation the official determinations of the president or State Department, presumably based upon information supplied by the foreign service or by other intelligence-gathering agencies.

Scharpf, *Judicial Review and The Political Questions: A Functional Analysis,* 75 Yale L.Rev. 517, 567 (1964). The Supreme Court in *Chicago & Southern Air Lines, Inc. v. Waterman S.S.,* 333 U.S. 103, 111, 68 S.Ct. 431, 436, 92 L.Ed. 568 (1948), expressed a similar view. In *Waterman,* the Court declared unreviewable a presidential decree approving a Civil Aeronautics Board order denying an overseas air route petition. The Court wrote:

The president, both as Commander-in-Chief and as the Nation's organ for foreign affairs, has available intelligence services whose reports are not and ought not to be published to the world. It would be intolerable that courts, without the relevant information, should review and perhaps nullify actions of the Executive taken on information properly held secret. Nor can courts sit *in camera* in order to be taken into confidences.

*Waterman,* 333 U.S. at 111, 68 S.Ct. at 436. Moreover, in *Atlee v. Laird,* 347 F.Supp 689 (E.D.Pa.1972) (three judge panel), the district court discussed the problems inherent in information gathering for a case implicating foreign policy:

First, the potentially relevant information in a foreign policy case comes from a multitude of sources—both domestic and foreign—and might, by sheer bulk alone, be unmanageable for a court. In addition, there is the very real possibility that the parties might not assemble all the data, in which case any attempt by the court to justify a decision on the merits of an issue having so profound an effect on the nation would be both difficult and unwise. Such a related problem concerns confidentiality. In certain instances, it would surely be conceded, the information necessary to a reasoned judgment should remain confidential. If, because of confidential information, not all the facts could be evaluated, any adjudication of a case whose decision might adversely affect this country's international posture would be imprudent.

*Id.* at 702 (citing *C & S Airlines v. Waterman S.S. Co.,* 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948)).

The concerns expressed by the courts in *Atlee* and *Waterman* apply to the case at hand. In order to make an accurate determination of the events which led to the death of Benjamin Linder, a great deal of information is necessary. This information includes: testimony from those present at the scene of the events; evidence of Linder's role in the activities of the Sandinista government; data concerning the degree to which the Defendants exercised control over those who allegedly carried out the

execution of Linder; the degree to which the Defendants knew or should have known that the events which took place would occur; and, more broadly, the scope and nature of war-making adopted and implemented by the contras. The information which is required for adjudication on the merits consists of elements which are both confidential and not readily accessible. The Defendants are unlikely to readily testify concerning the confidential information channels of their organization. Moreover, any information which the United States government may have regarding the relevant events is likely to be classified. Furthermore, aliens residing in foreign countries are not subject to the subpoena power of a United States court. *Gillars v. United States,* 182 F.2d 962, 978 (D.C.Cir.1950). Thus, Nicaraguan citizens residing in Nicaragua who witnessed the events would not be subject to the subpoena power of this court.

A great deal of the relevant information necessary for a determination of the allegations contained in the Amended Complaint is likely to be within the sole possession of the Nicaraguan government. Although the Nicaraguan government is no longer controlled by the Sandinistas, we have real doubts regarding the ease, willingness and ability of the present Nicaraguan government to provide the parties and the court with basic information which is needed to determine the issues presented. The new government represents an amalgam of various interests which were involved in the civil war. At this time it is impossible to determine the extent to which the government will be amenable to cooperation with the parties' fact-gathering efforts.

The real prospect that the parties would not be able to fully and fairly gather the data necessary to adjudicate this claim further undermines the ability of this court to adjudicate the claim on the merits. When a court finds itself without judicially manageable standards to determine the merits of a claim, the additional problems attendant to the information gathering process further discourage setting about so difficult a task. Moreover, the ramifications of adjudication of this case upon vital areas of foreign policy are too real to justify hearing the merits of this claim especially with the likelihood that a full factual development will be impossible. For a court to refuse to adjudicate the merits of this claim, where judicially manageable standards are lacking and severe informational barriers are likely to be encountered, is not an abdication of duty. Rather, it is simply a realization of the limitations upon a court's sphere of decision-making. *See United States v. Sisson,* 294 F.Supp. 515 (D.Ma.1968).

During the course of extended oral argument, the Plaintiffs conceded that information gathering problems might be presented in the course of this action. The Plaintiffs strenuously argued, however, that these problems should not be considered as a basis for abstention until such time as they are manifested during the course of discovery. In support of this position the Plaintiffs cite *Sharon v. Time, Inc.,* 599 F.Supp. 538 (S.D.N.Y.1984).

We are unpersuaded that *Sharon* bears on the determination of the political question issue in this action. The district court in *Sharon* acknowledged that:

> Limited access to information may stem from the nature of a particular case, thereby reflecting its possible unsuitability for judicial resolution. Even if the lack of evidence fails to establish a violation of due process, the fact that sensitive or secret material is central to the case and is unavailable must also be weighed in considering abstention.

*Sharon,* 599 F.Supp. at 550–51. While the court declined to apply the political question doctrine based on access problems, it carefully noted the extent to which relevant information had already been obtained by the defendant and the excellent prospects for the continued receipt of information necessary for the presentation of the defendant's case. *Id.* at 551. In contrast to *Sharon,* we have no reason to believe that the evidence necessary for a proper determination of this action has already been made available or will be readily made available in the future. We add that *Sharon* was a private libel action with readily ascertainable judicial standards. More-

over, unlike the instant case, *Sharon* had little potential for impact upon national affairs. Informational problems are of particular concern where the issues to be decided in a case are of broad national importance. *See Atlee,* 347 F.Supp. at 702. In short, the treatment of information gathering problems in *Sharon* should be narrowly tailored to the facts of that case.

### C. *Interference with Foreign Affairs*

Finally, we reiterate that the conduct of foreign affairs represents an area which has been repeatedly acknowledged to fall within the exclusive province of the legislative and executive branches of government. In *Oetjen v. Central Leather Co.,* 246 U.S. 297, 302, 38 S.Ct. 309, 310, 62 L.Ed. 726 (1918), the Supreme Court observed that "[t]he conduct of foreign relations of our government is committed by the constitution to the executive and legislative—'the political'—departments of the government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision." Foreign affairs matters have been seen to represent an area for which the judiciary has "neither aptitude, facilities nor responsibility and which has long been held to belong in the domain of political power not subject to judicial intrusion or inquiry." *Chicago and Southern Airlines, Inc. v. Waterman Steamship Co.,* 333 U.S. 103, 111, 68 S.Ct. 431, 436, 92 L.Ed. 568, 576 (1947) (citing *Coleman v. Miller,* 307 U.S. 433, 454, 59 S.Ct. 972, 982, 83 L.Ed. 1385 (1939)); *United States v. Curtiss–Wright Export Co.,* 299 U.S. 304, 319, 57 S.Ct. 216, 220, 81 L.Ed. 255, 262–63 (1936); *Oetjen v. Central Leather Co.,* 246 U.S. 297, 302, 38 S.Ct. 309, 310, 62 L.Ed. 726, 731. Accordingly, courts have frequently found cases which implicate the foreign relations of the United States to constitute political questions not fit for judicial resolution. *See e.g., In re Baiz,* 135 U.S. 403, 10 S.Ct. 854, 34 L.Ed. 222 (1890) (federal courts held not to have authority to review the refusal of the Department of State to issue immunity papers to the general counsel of a foreign nation because the executive alone possessed the power); *Dickson v. Ford,* 521 F.2d 234 (5th Cir.1975), *cert. denied,* 424 U.S. 954, 96 S.Ct. 1428, 47 L.Ed.2d 360 (1976) (establishment clause challenge to grants of foreign assistance to Israel found to raise nonjusticiable political question).

Controversies which implicate foreign affairs make up the largest group of cases to which the political question doctrine has been applied. However, it is clearly "error to suppose that *all* cases which [touch] foreign relations [lie] beyond judicial cognizance." *Baker,* 369 U.S. at 211, 82 S.Ct. at 707 (emphasis added). *See also Ramirez de Arellano v. Weinberger,* 745 F.2d 1500, 1512 (D.C.Cir.1984) (*en banc*), *vacated on other grounds,* 471 U.S. 1113, 105 S.Ct. 2353, 86 L.Ed.2d 255 (1985); *Committee of United States Citizens Living in Nicaragua v. Reagan,* 859 F.2d 929, 935 (D.C.Cir. 1988). When confronted with an issue which has ramifications upon our nation's foreign policy, we must examine "the particular question posed, in terms of its susceptibility to judicial handling ... and of the possible consequences of judicial action." *Baker,* 369 U.S. at 211–12, 82 S.Ct. at 708. Judicial power to reach the merits of a claim exists "only when adjudication is 'consistent with a system of separated powers and [the dispute is one] traditionally thought to be capable of resolution through the judicial process.'" *Allen v. Wright,* 468 U.S. 737, 752, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556, 570 (1984) (quoting *Flast v. Cohen,* 392 U.S. 83, 97, 88 S.Ct. 1942, 1951, 20 L.Ed.2d 947, 960 (1968)). Resolution of the issues presented by this case would require substantial judicial intrusion into the realm of foreign affairs.

During the past decade, the political branches of government have been actively involved in the turmoil in Nicaragua. From time to time the political branches have both financed and armed the contras in war-making and have withheld financial support from the contras. *See* Note, *The Legal Implications of United States Policy Toward Nicaragua: A Machiavellian Dilemma,* 22 S.D.L.R. 895, 898 (1985). For example, in November 1983, Congress enacted legislation which appropriated $24 million to finance covert activities in Nica-

ragua. *See* Intelligence Authorization Act for Fiscal Year 1984, Pub.L. No. 98–215, Reprinted in 1983 U.S.Code Cong. & Ad. News (97th Stat.) 1473. The stated purpose of the legislation was to support "directly or indirectly, military or paramilitary operations in Nicaragua." *See*, Sec. 108 Intelligence Authorization Act for Fiscal Year 1984. But in 1984, in the face of public disclosure and criticism of United States involvement in the mining of Nicaragua's harbors, Congress passed the Boland Amendment, which cut off all aid to the contras. *See United States v. Terrell*, 731 F.Supp. 473 (S.D.Fla.1989). Again in 1986, however, Congress approved additional moneys in aid to the contras. *See* Continuing Appropriations for Fiscal Year 1987, Pub.L. No. 99–500, Reprinted in 1986 U.S. Code Cong. & Ad.News (100 Stat.) 1783.

The active and mercurial role which the political branches played in the Nicaraguan civil war evinces the importance which policy toward Nicaragua has played in the overall foreign affairs of the United States. Courts have consistently refused to step into the political fray where issues of military tactics and stratagem carried forth by the political branches in the sensitive area of foreign affairs are concerned. *See, e.g., Holtzman v. Schlesinger*, 484 F.2d 1307, 1310 (2d Cir.1973) (bombing of Cambodia held to raise issues implicating diplomatic and military expertise not vested in the judiciary and thus political in nature), *cert. denied*, 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 286 (1974); *Pauling v. McNamara*, 331 F.2d 796, 798–99 (D.C.Cir.1963) (explosion of nuclear bombs held to constitute an important matter of basic national policy and to present no judicially cognizable issue), *cert. denied*, 377 U.S. 933, 84 S.Ct. 1336, 12 L.Ed.2d 297 (1964); *In Re Agent Orange Product Liability Litigation*, 818 F.2d 204 (2d Cir.1987) (executive branch decision to field-test agent orange not subject to judicial review).

When confronted with an issue which has ramifications upon our nation's foreign policy, a court must examine "the particular question posed, in terms of its susceptibility to judicial handling ... and the possible consequences of judicial action." *Baker*, 369 U.S. at 211, 82 S.Ct. at 707. While we recognize that Plaintiffs' claims represent only an action against the groups and individuals named as defendants, rather than a direct challenge to the conduct of foreign affairs by the political branches, we are required to examine "the possible consequences of judicial action" as they broadly affect foreign affairs.[7] *Baker*, 369 U.S. at 211–12, 82 S.Ct. at 707. *See also Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1547 (D.C.Cir.1984) *(En Banc)* (Tamm J. Dissenting).

The cornerstone of the Plaintiffs' broad claims consist of allegations that the Defendants are directly responsible for the events which occurred on April 28, 1987, when Linder was attacked by contra troops in Nicaragua. As we have noted, the Plaintiffs posit the liability of the Defendants on the theory that the contra troops, acting as agents of the Defendants, carried out the wishes of the Defendants in executing the attack on Linder. Alternatively, the Plaintiffs aver that the Defendants knew of the fact that the contra troops engaged in the execution and torture of wounded and defenseless persons and took no steps to stop the practices of their subordinates. Amended Complaint, at Paras. 56, 59. The Plaintiffs specifically claim that the Defendants "authorized, approved, directed and ratified the attack on the Cua–Bocay development project, and authorized, approved, directed, and ratified the attack that killed Benjamin Linder and two others, on April 28, 1987." Amended Complaint, at Para. 57. The Plaintiffs further represent that the planned attack on Linder was part of a "policy, pattern, and practice of widespread torture targeted at development workers and development projects for the purpose of destroying the projects and

---

**7.** Although the majority of cases which have been held to present political questions have involved actions brought against government officials, there are many cases between private individuals which have been adjudged to raise political questions. *See, e.g., Oetjen v. Central Leather Co.*, 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726 (1918); *Chicago and Southern Airlines, Inc. v. Waterman Steamship Co.*, 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568; 13A Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d § 3534.

terrifying other development workers, foreign and Nicaraguan, from engaging in similar development work." Amended Complaint, Para. 57–58.

The adjudication of the merits of these claims manifestly would require inquiry into the full scope of Defendants' *modus operandi* for carrying out warfare in Nicaragua. The Court would be required to make determinations regarding: the identity of those responsible for the creation and execution of contra military strategy; the precise nature and scope of the strategy employed by the contras; the physical location where the contras' decision-making procedures occurred; and the time during which strategy was formulated. Because of the intimate link between the contras' activities and the political branches' policy toward Nicaragua, an inquiry into the parameters of contra policy would surely involve efforts to uncover the nature of the relationship between United States policy and the actions of the contras. It is not difficult to imagine that the political branches could be hampered in their ability to conduct sensitive foreign policy initiatives with foreign groups involved in civil war if the conduct later becomes subject to suits by private citizens challenging the nature of war-making on foreign soil. At all events, the adjudication of this claim would implicate the inherent inability of the judiciary to predict the international consequences flowing from a decision on the

merits. *See Atlee*, 347 F.Supp. at 702; *Tel–Oren*, 726 F.2d at 774. And an adjudication on the merits surely would raise the "potentiality of embarrassment from multifarious pronouncements by various departments" in an area where there may be "an unusual need for unquestioning adherence to a political decision already made." *See Baker*, 369 U.S. at 217, 82 S.Ct. at 710. The actions of the contras arising out of the conduct of warfare on foreign soil during civil war, should be called into question, if at all, by the political branches of government to whom the conduct of foreign affairs is trusted.

For a court to involve itself in the adjudication of civil war in Nicaragua with neither judicially manageable standards nor any confidence in the thoroughness or accuracy of the information gathering process, would simply place too many actors on the diplomatic stage. *See Smith v. Reagan*, 844 F.2d 195 (4th Cir.1988).[8]

### III. CONCLUSION

For the foregoing reasons it is

ORDERED AND ADJUDGED that Defendants' Motion to Dismiss is hereby GRANTED.

DONE AND ORDERED.

---

8. Since we have found that the political question doctrine renders this action non-justiciable, we need not reach Defendants' claim that the Act of State Doctrine bars adjudication on the merits. However, this issue has been fully briefed, and in order to create a full record, we briefly address the issue. The Defendants argue that the court lacks subject matter jurisdiction under the Act of State Doctrine. Nevertheless, the Act of State Doctrine has no application to the actions of an insurgent group which has not been recognized by the political branches as the official government of Nicaragua. The Act of State Doctrine has been defined as "[precluding] the courts of this country from inquiring into the validity of the public acts [of] a *recognized* foreign sovereign power committed within its own territory." *Banco Nacional De Cuba v. Sabbatino*, 376 U.S. 398, 401, 84 S.Ct. 923, 926, 11 L.Ed.2d 804, 808 (1964) (emphasis added). In *Kirkpatrick Co. v. Environmental Tectonics Co.*, —— U.S. ——, 110 S.Ct. 701, 704, 107 L.Ed.2d 816 (1990), the Court wrote that "[i]n

every case in which we have held the act of state doctrine applicable, the relief sought or the defense interposed would have required a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory." *See also Oetjen v. Central Leather Co.*, 246 U.S. 297, 302–03, 38 S.Ct. 309, 313, 62 L.Ed. 726, 732 (1918); *Ricaud v. American Metal Co*, 246 U.S. 304, 309–10, 38 S.Ct. 312, 313–14, 62 L.Ed. 733, 736 (1918); *Tel–Oren v. Libyan Arab Republic*, 726 F.2d 774, 791 n. 21 (Edwards J. concurring). The Contras have not been recognized as the legitimate government of Nicaragua by the United States, and consequently, the Act of State Doctrine would not apply to this action. The present case differs from *Underhill v. Hernandez*, 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456 (1897), and its progeny in that the Contras have not been recognized as the legitimate government of Nicaragua. Thus the retroactive application of the Act of State Doctrine is not called into play.